**In the Matter of GRAND JURY INVESTIGATION OF the SHIPPING INDUSTRY.**

**Misc. No. 5-60.**

United States District Court
District of Columbia.

June 14, 1960.

300

Joseph J. Saunders, George Miron, John C. Danielson, Washington, D. C., Department of Justice, for the Government.

Charles F. Warren, Leonard James, Graham, James & Rolph, Washington, D. C., for States Marine Lines, Fred Olsen Line, Hamburg-American Line, Anglo Canadian Shipping Co., Ltd., Moller Steamship Company, Maersk Line Agency, Ivaran Lines, Overseas Ship-

ping Co., Western Canada Steamship Co., Balfour Guthrie & Co., Holland-American Line, East Asiatic Co., North German Lloyd Italian Line, Blue Star Line, Dimond and Co., and others.

Wharton Poor, Haight, Gardner, Poor & Havens, New York City, for Maersk Line, Moller Steamship Co., Inc., Maersk Line Agency.

Morton Zuckerman, Dunn & Zuckerman, New York City, for Iino Kaium Kaisha, Ltd.

Burton H. White, New York City, for N. V. Stoomvaart Maatschappij (Nederland) and Koninklijke Rotterdamsche, Lloyd N. V. under joint service name Ned-Lloyd Line and Java Pacific Line, Inc.

George Yamaoka, Edwin Longcope, New York City, Morton Liftin, Washington, D. C., Hill, Betts & Nash, New York City, for Daido Kaisen Kaisha, Ltd., Kawasaki Kisen Kaisha, Ltd., Mitsui S.S. Co., Ltd., Nippon Yusen Kaisha, Ltd., Norton, Lilly & Co., Inc., Osaka Shoshen Kaisha, Ltd., Wm. J. Rountree Co., Inc., Yamashita S.S. Co., Ltd.

Wharton Poor, New York City, for Ivaran Lines, Moller S. S. Co., Maersk Line.

Leonard G. James, San Francisco, Cal., for States Marine Lines, Fred Olsen Line, Hamburg-American Line and others.

Paul D. Page, Jr., Washington, D. C., for N. V. Stoomvaart Maatschappij (Nederland), and Koninklijke Rotterdamsche, Lloyd N. V. and Java Pacific Line, Inc.

Burlingham, Hupper & Kennedy, Washington, D. C., for Trans-Pacific Transp. Co., N. V. Stoomvaart Maatschappij Nederland, Koninklijke Rotterdamsche, Lloyd N. V. Java Pacific Line, Inc.

LEONARD P. WALSH, District Judge.

The Deputy Attorney General on November 24, 1959, authorized and directed that evidence of possible indictable criminal offenses which may have been committed in the ocean shipping industry be presented to a grand jury in the District of Columbia. The letter of the Deputy Attorney General reads in part as follows:

"The Department is informed that violations of the federal antitrust laws, the Shipping Act of 1916, and other federal statutes may have occurred and may still be occurring in connection with the activities and conduct of certain persons, firms, corporations, associations, organizations, and others engaged in the carriage of goods by water and in the forwarding, brokering and warehousing of goods carried by water."

Numerous subpoenas duces tecum were issued by the Clerk of the Court on December 29, 1959, and on other dates, directing more than 150 shipping firms, etc., to produce certain documents for use of the Grand Jury.[1]

---

1. Counsel for the Government on pp. 79–80 of the March 7, 1960, Transcript states: "Since December 29, 1959 over 150 subpoenas [have] been issued to shipping lines, their agents, and conferences. While many shipping lines have either already complied or are in the process of complying the approximately 59 firms here today have moved on numerous grounds to quash the subpoenas served on them. As your Honor may have noted, the government has prepared a tabular analysis showing the identity of the various movants and the grounds asserted by each. This analysis is attached to our first memorandum as Exhibit 2. * * * I hasten to add, however, that several motions to quash were filed following preparation of that table, so that unfortunately it is no longer complete. It is complete through 54 motions to quash filed on or before January 25, 1960."

Approximately 60 of those served with these subpoenas filed motions to quash. Supporting memoranda were filed by many of the movants, as well as by the Government.[2] Oral argument was had on March 7, 1960, and leave was granted certain movants to file memoranda concerning alleged new matters argued there, and the Government was subsequently permitted to file reply memoranda thereto. On April 8, 1960, certain movants moved the Court for leave to file reply memoranda to the Government's memoranda of March 25, 1960. The Court granted the motion and all of the memoranda, exhibits, etc., have now been submitted.

While the Government claims that the grand jury inquiry need not be preceded by any definition whatever of the crimes to be investigated or the persons against whom an accusation is sought, In re Grand Jury Proceedings, D.C.E.D.Penn. 1933, 4 F.Supp. 283 (see Court's discussion relating to this matter, infra), in its memorandum filed on February 8, 1960, the Government reviewed certain of the facts surrounding the challenged subpoenas so as to inform the Court of the nature of the grand jury inquiry. As set forth therein, the activities under investigation, at least initially, are identified as the "Far East Trade," the "Cotton Trade," and the "African Trade."

With respect to the Far East Trade, the shipping lines of several nations over the years have formed a number of shipping conferences (voluntary associations of ocean carriers) covering cargoes shipped between the Orient and the United States. In most cases, the agreements under which these conferences operate are filed with, and approved by, the Federal Maritime Board* pursuant to the Shipping Act of 1916, 46 U.S.C.A. § 801 et seq. However, as noted in Federal Maritime Board v. Isbrandtsen Co., 1956, 356 U.S. 481, 78 S.Ct. 851, 2 L.Ed.2d 926, some shipping lines refuse to join these conferences and do not adhere to the rates fixed by the conferences for certain products, and in fact, charge rates sufficiently lower than the conference rates such that rate wars may occur. As noted in the Isbrandtsen case, the conference carriers attempt to fight the competition by adopting certain practices which may be anti-competitive. The Government claims that during the time the Isbrandtsen case was pending in the Courts, the conference there involved opened rates (that is, abandoned Board authorized joint rate setting activities) on certain commodities and so represented to the Board that they were open. However, the Government claims contrary to their representations to the Board, they secretly and concertedly fixed rates on many of the so-called open rate items and may have conspired to conceal such agreements from the Board. The Government also claims that conference carriers attempted to foreclose competition of nonconference members through an exclusive patronage or dual rate system. The Government allegedly substantiates these claims with letters, etc.

The Cotton Trade is the second activity claimed to be under investigation here.[3] Apparently, until recent years shipments of the increasingly large

2. Because of the great number of movants in this case, except in rare instances, they will not be named specifically as objecting on certain grounds, etc., but rather they will be referred to as "movants" or as "certain," "some," etc., movants.

* Federal Maritime Board, hereinafter also referred to as Maritime Board, or Board.

3. Government's Exhibit 16 to their memorandum filed February 8, 1960, is copy of a letter written by an official of States Marine Lines agency and reads in part as follows:

"In closing, Dick, there is one aspect that I find I have overlooked and that is the inter-relationship of cotton areas to cotton shippers. In the main, the same cotton shippers that ship from the U.S. Gulf, ship from U.S. Pacific ports as well as Mexico and Central America. From these areas, they ship to the Far East as well as North Europe, United King-

amounts of cotton grown in the Western United States and Mexico have been loaded for export at California ports. However, the facilities at the Mexican Pacific ports of Ensenada and Guaymas have been greatly improved and the large-scale shipments of cotton out of those ports has come to be known as the "Cotton Trade", as used in this case.

With respect to the Ensenada trade, some Japanese lines have recently obtained a large share of the cotton shipments by offering favorable rates and accepting payment upon delivery in Japan in Japanese currency. The Pacific Westbound Conference (PWC) tried to meet the competition and as a result a rate war became a real possibility. However, an agreement was entered into by PWC and the Japanese lines in the summer of 1958. This agreement is claimed by the Government to be designed to equalize Ensenada to Japan rates with California-to-Japan rates and to prevent entry of competitors by prohibiting agents of the signatory lines from also representing any nonsignatory lines.

As to the Ensenada cotton shipped to Europe, competition in that trade apparently hurt the members of the Association of West India Trans-Atlantic Steamship Lines (Witass) and the Pacific Coast European Conference (PCE). A new conference, the Ensenada/European Conference (E/EC) was formed (presumably of PCE members). The E/EC allegedly instituted a deferred rebate system and a "fighting rate" for the Ensenada-to-Europe trade designed to eliminate the Wallenius Line as an effective competitor.[4] This would presumably, if successful, permit the rates for Ensenada-to-Europe to be equalized with California-to-Europe rates.

The Government also claims that the Guaymas cotton trade has resulted in activities which bear investigation. At that port the States Marine Lines and others have entered into an agreement with Japanese lines, after threats were allegedly made by the former to slash rates. The Government quotes from a letter sent by an official of States Marine Lines to the effect that the Guaymas Association, covering Guaymas to Japan cotton trade, is contrary to that of a "competitive program".

Competition over the Guaymas to Europe cotton trade apparently resulted in the establishment by Witass of a Mexico-Pacific Subcommittee in San Francisco, which instituted a "fighting rate" deferred rebate system to eliminate the competition of Wallenius Lines in that trade.

With respect to both the Ensenada and Guaymas cotton trade, the Government suggests that certain United States grown cotton may be shipped by rail to Mexico for transshipment overseas from these Mexican ports, but this is denied by movants involved in the cotton trade.

A new service entered the African Trade in 1958, operating under the style "Baron Line" and using Japanese vessels chartered to United States Navigation Company. It is claimed by the Government that certain of the movants here organized a program of "fighting rates" or selectively reducing rates on important commodities in that trade, with the intent to "freeze out" competitors. A committee was purportedly formed to supervise the rate reduction programs and "kill off" the Baron Line.

---

dom, Mediterranean, India, Canada, and South Africa. To a great extent, what we do for them in one area affects what we get from them in another area and * * *.

"* * * If you drop the freight rate at one point, immediately there is pressure to drop the rate at all other shipping points. To avoid a continual whip-sawing of the rates, to the car-

riers' disadvantage, it is of vital importance to maintain the established differentials mentioned early in this report."

4. Deferred rebates, "fighting rates," retaliation, and certain other anti-competitive and discriminatory conduct are banned by section 14 of the Shipping Act, 46 U.S.C.A. § 812.

## I

■ The first question to be treated here is whether the grand jury has jurisdiction over the subject matter under investigation.

As already noted, the matter was referred to the grand jury by the Deputy Attorney General, who in turn had been forwarded certain material by the House Antitrust Subcommittee for possible grand jury action. The extensive transcript of the Congressional Hearings has been reviewed in some detail. "Monopoly Problems in Regulated Industries," Hearings before the Antitrust Subcommittee (Subcommittee No. 5) of the Committee on the Judiciary, House of Representatives, 86th Congress, 1st Session, pp. 1–5656 (1959).

The Government asserts that until an accusation has been lodged no challenge to the subject matter jurisdiction of the grand jury may be entertained. There are a number of cases favoring the Government's position which lend themselves to extensive quoting. In the main they attribute an almost unlimited power and independence to the grand jury in its *essential* functions. Adherents of this view would make exceptions only in rare instances. However, there is also authority for the view that the courts may and should exercise *supervisory* authority over the grand jury in certain instances. The main difference in the views appears to be that the former is perhaps more liberal in the construction of the powers and independence of the grand jury.

Recent cases according broad powers and independence to grand juries are: In re April 1956 Term Grand Jury, 7 Cir., 1956, 239 F.2d 263; United States v. United States District Court, 4 Cir., 1956, 238 F.2d 713.

Most courts taking this position cite the cases of Blair v. United States, 1919, 250 U.S. 273, 39 S.Ct. 468, 63 L.Ed. 979; Hale v. Henkel, 1905, 201 U.S. 43, 26 S.Ct. 370, 50 L.Ed. 652, and Hendricks v. United States, 1912, 223 U.S. 178, 32 S.Ct. 313, 56 L.Ed. 394, among their authorities.

The position of the Supreme Court on the matter is perhaps best summarized in the Blair case, wherein it was held that witnesses were not entitled to take exception to the jurisdiction of the grand jury as to the subject matter under investigation [250 U.S. 273, 39 S.Ct. 471]:

> "* * * It is a grand inquest, a body with powers of investigation and inquisition, the scope of whose inquiries is not to be limited narrowly by questions of propriety or forecasts of the probable result of the investigation, or by doubts whether any particular individual will be found properly subject to an accusation of crime. As has been said before, the identity of the offender, and the precise nature of the offense, if there be one, normally are developed at the conclusion of the grand jury's labors, not at the beginning.
>
> "And, for the same reasons, witnesses are not entitled to take exception to the jurisdiction of the grand jury or the court over the particular subject-matter that is under investigation. In truth it is, in the ordinary case no concern of one summoned as a witness whether the offense is within the jurisdiction of the court or not. At least, the court and grand jury have authority and jurisdiction to investigate the facts in order to determine the question whether the facts show a case within their jurisdiction."

Judge Hand is among those who attribute almost unlimited authority to the grand jury over its functions. In re Kittle, C.C.S.D.N.Y.1910, 180 F. 946.

As noted earlier, this is not to say that instances do not arise where the courts may find reason to inquire into purposes of or control the course of a grand jury investigation. For instance, in the case of In re National Window Glass Workers, D.C.N.D.Ohio 1922, 287 F. 219, 225, cited by the Movant, it was held that a "supervisory duty, not only exists, but is imposed upon the court, to see that its grand jury and its

process are not abused, or used for purposes of oppression and injustice." The court there went on to determine that the problem comes down to the question of what is an abuse of process and whether one existed in that case. While the court did not go on to define an abuse of process, it found that an abuse existed in that the dominating object of the investigation was to examine witnesses in advance of trial, and to procure evidence for use in the trial of the same parties who were defendants on an indictment pending in another United States District Court. However, even there the court found a need for only "limited interference" with the grand jury investigation. The subpoenas were vacated; but in effect, the investigation was merely suspended pending the outcome of the case in the other jurisdiction, or pending certain other specified action by the Government.

A review of all the facts and allegations of the movants here fails to bring to light any showing of an abuse of process by the grand jury involving the subject matter under investigation. Or, as the court in Application of Radio Corp. of America, D.C.S.D.N.Y.1952, 13 F.R.D. 167, 172, stated: "All in all, this is not one of those rare cases where the Court should exercise its power to deny process to the Grand Jury."

A determination of the subject matter to be investigated is considered to be an essential function of a grand jury and whether any intrusion upon that function is characterized as a "rare instance" denying process to, or the exercise of a supervisory duty over, the grand jury, such intrusion does not appear warranted in this case except as hereinafter specifically set forth.

Certain movants allege that "while jurisdictional grounds of objection may be referred to at the time of any indictment, it seems clear that under the circumstances of the present case where no *proper* indictment could be brought against the movants, the Court should inquire into and decide the jurisdictional question at the outset in order to avoid the tremendous burdens which would be imposed upon these movants if the investigation were allowed to proceed." (Emphasis supplied.)

An answer to that argument may be that in most, if not all, instances these jurisdictional questions are premature.

Judge Kirkland of this Court in In re Investigation of World Arrangements etc., D.C.D.C.1952, 13 F.R.D. 280, 287, was faced with a similar question in a case that was in the same posture as the present case, i. e., there was a challenge of the subject matter jurisdiction at the grand jury stage, and he determined that the motions to quash were premature (with one exception, which is mentioned later).

The challenge here, with respect to jurisdiction over the subject matter, is also held to be premature. For instance, it would be sheer speculation for this Court to predict the outcome of the grand jury's deliberations and to conclude that it cannot return any indictment which the Court cannot recognize. Nor, must this Court predict that any indictment will follow from this inquiry.

Movants rely heavily on the case of United States v. Alaska S. S. Co., D.C. W.D.Wash.1952, 110 F.Supp. 104, where the District Court found that the Federal Maritime Board had primary jurisdiction of the controversy. However, while the court's ruling in that case resulted in a dismissal of an indictment, it is obvious that the ruling occurred at a different stage in the proceedings.[5]

---

5. The following exchange appears in the Transcript of hearing of March 7, 1960, p. 171:
"The Court: Now, are you familiar with the procedure in the Alaska case?
"Mr. James: Yes, to a certain extent.

"The Court: Did they file any motions comparable to these in the Alaska case?
"Mr. James: Prior to the investigation they did not do so.
"The Court: Prior to the indictment?
"Mr. James: Prior to the indictment they did not do so. They filed a mo-

The Court finds that the grand jury here is clearly within its jurisdiction in investigating the general subject matter under inquiry, the matter having been referred to the Justice Department by a Congressional Subcommittee for that purpose.

## II

This leads the Court to consider the next and related question: whether primary jurisdiction in the Federal Maritime Board bars the pending inquiry.

As noted earlier, a letter from the Deputy Attorney General directing the presentation of evidence of possible criminal offenses to a grand jury, stated that the Department of Justice had been "informed that violations of the federal antitrust laws, the Shipping Act of 1916, and other federal statutes may· have occurred and may still be occurring." [6]

Although the Congressional hearings were relatively lengthy, additional hearings on the shipping industry have been held by the same subcommittee. Congressional Record, Vol. 106, No. 84, May 9, 1960, p. D. 392.

The movants allege that inasmuch as the case of Federal Maritime Board v. Isbrandtsen Co., supra, restated the proposition that the Maritime Board's primary jurisdiction precludes the United States from proceeding with antitrust proceedings in certain cases, that case is controlling here and precludes the grand jury from proceeding with its inquiry.

However, the Isbrandtsen case obviously did not state that the Board's primary jurisdiction precludes a grand jury

inquiry. The Court did, however, interpret the cases of United States Navigation Co. v. Cunard, 1932, 284 U.S. 474, 52 S.Ct. 247, 76 L.Ed. 408 and Far East Conference v. United States, 1952, 342 U.S. 570, 72 S.Ct. 492, 96 L.Ed. 576 to mean that "the courts, while retaining the final authority to expound the statute [the Shipping Act], should avail themselves of the aid implicit in the agency's superiority in gathering the relevant facts and in marshalling them into a meaningful pattern * * *." [356 U.S. 481, 78 S.Ct. 861] As noted by the Supreme Court in the Far East case [342 U.S. 570, 72 S.Ct. 494], "Uniformity and consistency in the regulation of business entrusted to a particular agency are secured, and the limited functions of review by the judiciary are more rationally exercised, by preliminary resort for ascertaining and interpreting the circumstances underlying legal issues to agencies that are better equipped than courts by specialization, by insight gained through experience, and by more flexible procedure."

As also noted in 3 Davis "Administrative Law Treatise," Sec. 1901–1909, a determination by a court that an agency has primary jurisdiction does not necessarily mean that the court will refrain from deciding the case before it; it may mean only that the court will postpone its action on the case before it until after the agency has made a *designated* determination. Yet, the movants here would have this Court forecast that any action coming before it later would be dismissed on the ground, at least, of primary jurisdiction.[7]

tion for summary judgment subsequent to the indictment. In fact, I believe it was a grand jury indictment in that proceeding, yes."

6. March 7, 1960, Transcript, p. 11: [Movant's counsel]: "I might say that the proceeding * * * arises from another investigation of the shipping industry conducted by the Antitrust Subcommittee of the House. * * * Mr. Celler, the Chairman of that Committee, transmitted to the Department of Justice and to the Federal Maritime Board,

documents, which, in his opinion, consisted of violations of Antitrust Laws of the United States, or of the United States Shipping Act which was passed in 1916 * * *."

7. Some of the movants appear to frame their motions urging the adoption of the doctrine of primary jurisdiction in the nature of a motion to dismiss; others ask that the doctrine be considered as bearing on reasonableness of demand. It is considered this opinion meets both urgings.

A court in this jurisdiction may choose to retain any case, arising out of any action of this grand jury's inquiry on its docket pending any matter referred to the Board for action. Such a determination would not, it would appear, be inconsistent with the holding in the Far East case. In re Investigation of World Arrangements, supra.

Much of the movant's arguments urging their motions on the basis of primary jurisdiction is based on the assumption that there is only involved in this investigation matters under the jurisdiction of the Board as provided in the Shipping Act. This dismisses the possibility, suggested in the Deputy Attorney General's letter cited earlier, of the violation of the antitrust laws [8] and other statutes, and it also dismisses the possibility that the subpoenaed records here may furnish a "vital link in the chain of evidence indicating violations of antitrust [and other federal] laws by others." [9]

However, it does not appear that the Shipping Act wholly supersedes the antitrust laws as they pertain to the shipping industry. For instance, while the Sherman Act prohibits monopoly and attempts to monopolize, the Shipping Act appears only to prohibit, in sections 14, 15, and 16, the means by which monopoly may be achieved; the Sherman Act permits the Government and private persons preliminary injunctive relief against threatened or actual antitrust practices; the Shipping Act appears to offer no comparable remedy; and, the sanctions of the Sherman Act appear broader in that denial of the use of the Panama Canal may be applied, for instance, for certain violations, etc., (15 U.S.C.A. § 31).

Therefore, on the basis of the discussion throughout this section, the Court refuses to accept the movants' arguments urging their motions to quash on the basis that the antitrust laws are *wholly* superseded by the Shipping Act.

The Government has made the allegation here that the statute of limitations may run against the alleged violations while the matter is pending before the Maritime Board if the primary jurisdiction argument is permitted to postpone the instant inquiry.

This is a claim which deserves consideration. As noted in Riss & Co. v. Association of American Railroads, D.C. D.C.1959, 170 F.Supp. 354, 369, certiorari denied 1959, 361 U.S. 804, 80 S.Ct. 108, 4 L.Ed.2d 57, wherein a motion to dismiss a complaint in a civil antitrust suit under the Interstate Commerce Act, 49 U.S.C.A. § 5b (9) with respect to the prospect of referring the matter to the Interstate Commerce Commission, it was observed that "It would thus seem that a reasonable time before the commission action might well be measured in years rather than months." [10]

---

8. The Sherman Act, 15 U.S.C.A. § 1, reads in part as follows: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states, or with foreign nations, is declared to be illegal * * *."

9. Application of Radio Corp. of America, supra, 13 F.R.D. at page 170: "RCA's records may furnish a vital link in the chain of evidence indicating violations of the antitrust laws by others. The Grand Jury may indict RCA together with others on a conspiracy charge. The Grand Jury may indict RCA alone. * * It may indict no one at all. In sum, whether any indictment will be returned, and if so, the subject matter, the precise charge and against whom made, are matters of sheer speculation."

10. But what may be more important for purposes of this case, the court in the Riss case held that where it had an allegation of conspiracy (15 U.S.C.A. § 1 et seq.) before it, that even "if the Commission were to decide that the rate reduction, considered by itself, conformed to standards of the Interstate Commerce Act, it is nevertheless well settled that a lawful act may be validly alleged as forming a part of a conspiracy for an unlawful purpose, such as to restrain trade." The court also stated at page 364, "Thus, it is clear that the problem of whether or not a district court should refer certain issues to an administrative agency was not squarely before the court in the Isbrandtsen case."

Judge Sirica in the Riss case was asked by the movants there to speculate as to how an agency would rule if a matter were referred to it. This he refused to do:

> "The basic reason behind defendant's motion to suspend is the expectation of obtaining an I.C.C. ruling that the * * * rate reduction is 'immunized' from the operation of the antitrust laws. * * * This Court cannot say how the Commission would be likely to rule if this. issue *alone* were submitted to it." (Emphasis supplied.)[11]

The movants here would ask this Court to engage in an even more advanced type of speculation. They would have the Court speculate as to what findings, indictments, etc., a grand jury may return, and then go one step further and speculate as to what a court would do if and when a matter were referred to it as a result of the grand jury's action. Only for the most compelling reasons would, it is considered, a court choose to engage in such type of speculation.

Judge Lord in the recent case of Pennsylvania Motor Truck Ass'n v. Port of Philadelphia Marine Terminal Ass'n, D. C.Pa., 183 F.Supp. 910, concluded that the decision there was in no way contingent upon the expertise of the Maritime Board and proceeded to issue an injunction sought without referral of the matter to the Board. The Court in so doing, relied on the cases of River Plate and Brazil Conferences v. Pressed Steel Car Co., 2 Cir., 1955, 227 F.2d 60 and Isbrandtsen Co. v. United States, D.C.S.D. N.Y.1948, 81 F.Supp. 544, appeal dismissed A/S J. Ludwig Mowinckels Rederi v. Isbrandtsen Co., 336 U.S. 941, 69 S.

Ct. 813, 93 L.Ed. 1099. The court also distinguished the holding of the court in United States Trucking Corp. v. American ˙ Export Lines, D.C.S.D.N.Y.1956, 148 F.Supp. 61 by expressly acknowledging the continuing vitality of ˙the holdings that a district court could maintain the *status quo* by enjoining conference agreements pending administrative proceedings before the Board. Judge Lord found that in balancing the equities in the American Export case, the court merely concluded that an injunction should not issue but did not conclude that it had no power to issue an injunction.

The claim by the movants here, therefore, that the courts must yield to the primary jurisdiction of the regulatory agencies rests in most cases on the facts in each particular case. It will be the function of the grand jury here to bring forth the facts in some detail, if and when further proceedings result from the inquiry.

The question is also raised in this case as to whether the primary jurisdiction doctrine would seem to be more forceful in civil cases involving the regulatory scheme or rates set by any agency, than it would be in criminal violations where the regulatory scheme or rate structure was not primarily involved.

The movants cite the case of United States v. Pacific & A. R. & N. Co., 1913, 228 U.S. 87, 33 S.Ct. 443, 57 L.Ed. 742, for authority that the Supreme Court has expressly approved the application of the doctrine of primary jurisdiction to activities which are defined as crimes in a regulatory statute, and it is claimed this doctrine was reaffirmed in the recent case of United States v. Radio Corporation of America (RCA), 1959, 358

11. It was Judge Sirica's opinion that the Court of Appeals of this jurisdiction in Atchison, Topeka and Santa Fe Railway Co. v. Aircoach Transportation Ass'n, Inc., 1958, 102 U.S.App.D.C. 355, 253 F.2d 877, had interpreted the Isbrandtsen case as merely limiting the District Court's discretion to refer issues: "It is the governing rule now that the issue of the intent and effect of a rate.reduction, claimed to have been taken pursuant to˙ procedures set forth in *agreements approved by the Commission'*under Section 5a of the Interstate Commerce Act, must, *in a case where such issue is the sole or dominant issue,* first be referred to the Commission prior to a Court determination of whether such rate reduction violates the antitrust laws." [170 F.Supp. 354]

U.S. 334, 79 S.Ct. 457, 465, 3 L.Ed.2d 354. But, while the court in the Pacific case did uphold the dismissal of criminal charges of violation of the Interstate Commerce Act, as amended (49 U.S.C.A. § 1 et seq.) until the matter had been passed on by the Interstate Commerce Commission, they also upheld the counts of the indictment charging the same conduct, as to which, the counts under the Commerce Act were to be dismissed, to be violations of the Sherman Act. The matter seems to be somewhat cleared up by the RCA case. There the Court held that the legislative history of the Communications Act of 1934, as amended (47 U.S.C.A. § 151, et seq.), revealed that the Commission was not given the power to decide antitrust issues as such, and that the Commission action was not intended to prevent the enforcement of the antitrust laws in the federal courts. However, the court went on to hold that, despite this, the over-all regulatory scheme of that Act required the invocation of the primary jurisdiction doctrine *except when* "the action was only for the purpose of dissolving the conspiracy through which the allegedly invalid rates were set for in such a case there would be no interference with rate structures or a regulatory scheme." It was further observed by the Court that "there being no pervasive regulatory scheme, and no rate structures to throw out of balance, sporadic action by federal courts can work no mischief".

The movants claim that the inquiry here in reality is merely an attempt by the Government to "grasp at straws in attempts to defeat the primary jurisdiction of the Board" and that the case of

United States v. Alaska S. S. Co., supra, controls. However, in that case there was an indictment for the court to pass upon. Also, the court there may have gone further by dismissing the indictment than would a court in this jurisdiction in a similar case. For, as noted in the memorandum of the General Counsel of the Maritime Board in an opinion printed, pp. 926–938, of the Hearings of the Antitrust Subcommittee, supra: " * * * The Alaska Steamship Co. case is the only judicial decision, so far as we know, squarely passing upon the question whether the penal provisions of the Shipping Act, 1916, supersede those of the antitrust laws". The fact that the indictment was dismissed in the Alaska case need not raise the presumption that all indictments in all cases involving primary jurisdiction of the Maritime Board will result in a dismissal, or the invocation of the "doctrine."

 This discussion leads the Court to the conclusion that, though the doctrine of primary jurisdiction may be applied to both civil and to criminal actions, it is more forceful in the civil regulatory type actions than in criminal actions for in the latter actions the violations of other federal statutes may more often be involved, and the regulatory scheme less affected.

The Court cannot ignore the fact that, especially as to an investigation of the shipping industry involving foreign commerce, the Maritime Board is claimed to be, and may be, unable to investigate certain activities.[12]

Several cases could be envisioned wherein the administrative agency charged with the regulation of an indus-

12. Hearings. Antitrust Subcommittee, supra, p. 120:
 "Mr. Donohue. Well, Mr. Chairman, I would like to ask the Chairman of the [Maritime] Board—do we understand, or do you want us to understand, that you have been unable to police the shipping industry because of lack of money and lack of personnel.
 "Mr. Morse. I think it is fair to say that we have not adequately done our job because of lack of personnel.

 "Mr. Donohue. In other words, you have not been investigating, or you have not been checking the activities of these different steamship lines, because you have not had the personnel to do the checking for you, is that correct?
 "Mr. Morse. We have not gone on what I may call fishing expeditions. We have done checking where there have been complaints made."

309

try for one reason or another could not or would not engage in investigations of the type envisaged by the grand jury here unless, or even if, complaints were made to it. We have seen in the case of Pennsylvania Motor Truck Ass'n et al. v. Port of Philadelphia Marine Terminal Ass'n et al., supra, that the court granted an injunction where a plea was made that the Maritime Board could not or would not stay the enforcement of a disputed provision of a tariff pending its determination.

The representatives of the Maritime Board meanwhile are on record as stating that there are agreements which carriers may enter into which are definitely not encompassed by the Shipping Act.[13] Who can predict that such or similar violations may not be found by the grand jury in the course of their inquiry here?

The Government here also alleges that there may exist violations of the Federal false statement statute (18 U.S.C. § 1001), which may result in an indictment for violation of a federal statute. Since the transcript of the hearings before the Antitrust Subcommittee is replete with agreements, statements, etc., filed with the Board, and since the subpoenas call for the production of such agreements, etc., the Court must give due consideration to this claim.

█ Certain of the movants claim that since the special legislation here, the Shipping Act (46 U.S.C.A. § 820), calls for the reports, etc., and provides a penalty therefore, even if a false report or agreement were filed with the Board and an indictment returned, the matter should be dismissed and referred to the Board. However, without ruling on the matter, it may be that a false statement filed with an agency may violate not only the special statute but the false statement statute as well. United States v. Gilliland, 1941, 312 U.S. 86, 61 S.Ct. 518, 85 L.Ed. 598. For that reason, until, if, and when an indictment is returned, this Court would be premature in ruling on this matter.

While it is admitted that the doctrine of primary jurisdiction has its role in the law, the movants would now interpose the administrative agency between the grand jury (the so-called conscience of the community) and its investigation, by applying to the grand jury the doctrine of primary jurisdiction.[14]

█ Would it not be more proper to permit the grand jury to conduct its inquiry and then, if any action is instituted as a result thereof, to consider the question of primary jurisdiction at that time? If the Court, for instance, were later presented with an indictment, would that not be the proper time to do that which was done in the Cunard case, i. e., compare the enumerations of wrongs charged in the bill with the provisions of the Shipping Act, etc., to determine whether the matter should be referred to the Board? It would seem so to this Court.

The value to our society of the grand jury, as we know it today, would be

13. Hearings before the Antitrust Subcommittee, supra, p. 45:

"The Chairman: Can you give any examples of the kind of agreements between persons subject to the act that would not be covered by section 15?

"Mr. Morse [the then chairman of the Maritime Board]: Sure. If two common carriers agree that they will buy bunkers from one oil company, or agree that they will not buy from a given company.

"The Chairman: That would not be subject to the act?

"Mr. Morse: No, sir. It doesn't involve transportation.

"The Chairman. If they are not subject to the act—perhaps your counsel might want to answer this—would such an agreement as indicated by Chairman Morse be subject to the antitrust law?

"Mr. Aptaker [Board counsel]: Yes, I believe that would be, because it is not in the area carved out from the antitrust laws."

14. There is great controversy today, as it is, with respect to the role to be played in our society by the administrative agencies. Hector, Problems of the Civil Aeronautics Board and the Independent Commissions, Memorandum to the President, submitted September 10, 1959 (mimeographed).

greatly and swiftly debased were this Court to hold that its actions must await initial determinations by an administrative agency, except for compelling reasons. Grand juries have consistently been found capable of making extensive investigations of highly complex businesses, problems, etc. Application of Radio-Corporation of America, supra. There is no reason to believe that there will be any diminution of that investigative ability and capacity merely because the ocean shipping industry is here involved.

The Court, therefore, concludes that it would be an improper exercise of its jurisdiction here to interfere with the grand jury inquiry on the basis of primary jurisdiction in the Board in view of the law as reviewed above and the facts as they exist in this case. Such action, it is considered, would be premature. Whether the doctrine of primary jurisdiction should apply at any time to a grand jury proceeding is conjectural; however, the Court is satisfied it should not be permitted to apply here.

As Justice Frankfurter observed in the Far East Conference case, the doctrine is and may be applied when the court is presented with a complaint or indictment or any motion emanating as a result of the filing of either in cases, "raising issues of fact not within the conventional experiences of judges or cases requiring the exercise of administrative discretion." [342 U.S. 570, 72 S.Ct. 494] However, the application of the doctrine, if and when it ever were applied, to the grand jury, an investigative body, should be very rare it would seem.

The earlier portion of this section may be said to have dealt more with the motions of those movants who ask that the Court consider the doctrine of primary jurisdiction as bearing primarily upon the reasonableness and appropriateness of the demands in the subpoenas, while the latter portion may be said to have dealt more with those motions framed in the nature of a motion to dismiss on the same grounds.

Meanwhile, the Court has not intended by the foregoing discussion, nor the discussion elsewhere in this opinion, to in any way prejudge any matter that may be forthcoming, if and when any bill or indictment should follow the grand jury inquiry. The Court would in the case of such an eventuality look at the problem anew for the Court was greatly impressed by the forceful and persuasive arguments advanced by the movants.

### III

A number of the movants claim that activities concerning the carriage of cargo from ports in one foreign country to ports in another foreign country pertain to matters beyond the territorial jurisdiction of the United States. Therefore, it is claimed, these activities do not involve foreign commerce of the United States and thus cannot possibly involve violations of the Sherman Act (15 U.S. C.A. § 1, et seq.). This claim is made with reference to the Cotton Trade subpoenas.

The Government meanwhile contends: (1) many of the shipping lines maintain offices in the United States and make bookings for loadings of cotton at Mexican ports; (2) some of the conferences and committees are located in the United States; (3) some of the meetings of the conferences are held here; and (4) that the agreements made or carried out at least in part within the United States are for the purpose of restraining trade.

It appears that the activity complained of in the Cotton Trade may affect American commerce with foreign nations and indeed this seems to be admitted by many of the movants.

Discussions of hypothetical situations by members of the Antitrust Subcommittee and Board representatives, Hearings, supra, pp. 284, 287, seem to establish that the Chairman of the Maritime Board considers that "any foreign-to-foreign movement [of commerce], if it is in competition, does affect the commerce of the United States" but that the Board does not have *direct* jurisdiction of foreign-to-foreign activity and that "any

action of the Board to approve a foreign-to-foreign conference [for instance] is void." He declined to answer, however, whether he considered antitrust laws applicable in certain foreign commerce situations.

It is noted, therefore, that the Shipping Act itself recognizes the effect that foreign-to-foreign commerce may have on trade or commerce with foreign nations and in fact provides the Board with certain sanctions in the event foreign conferences discriminate against United States Shipping lines. The Chairman of the Board in the Hearings before the Antitrust Subcommittee, supra, p. 159, "Statement of Clarence G. Morse, Chairman, Federal Maritime Board and Maritime Administrator", observed that indirect jurisdiction of the Board with respect to foreign-to-foreign conferences exists, and is in fact a necessary power: [15]

"Although the Board has no direct jurisdiction over foreign-to-foreign conferences, section 14(a) of the Shipping Act, 1916, provides that if such conferences which use deferred rebates or other practices forbidden by section 14, refuse to admit U. S.-flag carriers on equal terms and conditions with foreign-flag members, then those foreign-flag members may be denied entry of their vessels into U. S. ports * * * admission is often necessary for successful operation of a line on an essential U. S. foreign trade route, * * *." (Emphasis supplied.)

Chairman Celler of the Subcommittee stated, Hearings, supra (p. 2352), that though the "Cotton Trade" (Ensenada-Japan agreement) may not be subject to the Shipping Act, it did, in his opinion "affect" the foreign commerce of the United States and thus was within the purview of the Sherman Act.[16]

While the memorandum of the Government, which is incorporated in an affidavit of one of the counsel for the Justice Department in this matter (see also the claim in Transcript of March 7, 1960, p. 117), suggests that the American grown cotton may be moving from Arizona and California into Mexico, and be shipped out of Mexican ports, such as Ensenada, the movants in a memorandum filed April 5, 1960, attach an affidavit of the Executive Vice President and Secretary of the Western Cotton Shippers Association to the effect, that to his knowledge, no American grown cotton is moving out of Mexican ports. Yet, on the other hand, we find on pp. 2321, 2351, Hearings, supra, evidence to the effect that such shipments were at least planned, if not now in effect, with respect to Arizona grown cotton. At least, there existed, or exists, the threat of such shipments occurring in the future.

It was also pointed out in the Hearings, supra, pp. 2440, 2442, that the Ensenada/European Conference (E/EC) membership, Chairman, and headquarters (San Francisco) are the same as that of the Pacific Coast European Conference (PCEC). It was, therefore, suggested that while perhaps the E/EC was established to avoid Maritime Board jurisdiction, yet it conducts meetings and business from this country (and permits its members to make bookings for Mexican shipments from here). In a similar situation involving Canadian trade, a Canadian section of the PCEC was established. However, no Mexican section for PCEC has been set up and deferred rebates, "fighting rates", market sharing agreements, etc., are allegedly employed in the latter trade which it is claimed is affecting this country's foreign commerce.

This Court is thus faced with a situation where—certain agreements were al-

---

15. See also Hearings, supra, pp. 2312–2578.

16. Chairman Celler also stated, p. 2377, that he considered the Guaymas Association agreement as affecting the commerce of the United States and so was subject to the Sherman Act.

legedly made, planned or entered into in the United States and are partially, at least, administered (through conference offices or otherwise) in the United States, members of the agreements take certain actions (such as bookings for shipments) within this country with respect Mexican exports,[17] have close association with *de facto* parent conferences in this country,[18] where the threat of American grown cotton as Mexican exports exists, which members of the Congressional Subcommittee consider to be violative of the Sherman Act, and as a result considers that—the foreign commerce of this country is clearly considered to be "affected" thereby.

The question here is whether these agreements, which appear to "affect" the foreign commerce of this country, constitute an illegal combination or conspiracy such as to amount to a restraint of trade on the foreign commerce of this country, or otherwise violate federal laws. Who is to answer this question if not a grand jury? While the Board admits the "Cotton Trade" affects our foreign commerce, it denies that it has jurisdiction (and suggests it does not have the funds) to investigate the matter and several of the movants agree.

Certain of the movants claim that the Sherman Act scope of "trade and commerce * * * with foreign nations" is limited to the export-import product of the United States. However, the Report of the Attorney General's National Committee, to Study the Antitrust Laws of March 31, 1955, pp. 77–80, disagrees with such a restrictive construction of the Act.

The Court in the case of United States v. Pacific & A. R. & N. Co., 1913, 228 U.S. 87, 33 S.Ct. 443, 448, 57 L.Ed. 742, decided it was not giving extra terri-

torial effect to the Sherman Act by holding that it forbids a combination of a foreign and domestic corporation from restraining and monopolizing trade in the transportation of freight and passengers between Puget Sound and the Yukon River. Part of this route lies within Canada. In the course of its opinion, the Court in answering an argument of the Defendants that jurisdiction did not lie as to the foreign carriage, stated as follows:

"This is but saying that laws have no extraterritorial operation; but to apply the proposition as defendants apply it would put the transportation route described in the indictment out of the control of either Canada or the United States. These consequences we cannot accept."

While it is admitted that the transportation in that case was initiated or terminated, if not also partially effected, on United States soil, the Court cannot predict what further evidence [19] of an effect on this country's foreign commerce will be uncovered by the grand jury in this case.

The cases hold that the intent and the result of affecting United States foreign commerce by an agreement to restrain trade brings the matter within the Sherman Act. In the case of United States v. Aluminum Co. of America, 2 Cir., 1945, 148 F.2d 416, the court found that where an agreement is entered into wherein (1) an intent to affect imports or exports is shown, and (2) where the agreement in its performance is shown actually to have had some effect upon them, then, the Sherman Act was intended to cover such agreements. See also United States v. Sisal Sales Corp., 1927, 274 U.S. 268, 47 S.Ct. 592, 71 L.Ed. 1042; United States v. Timken Roller Bearing Co.,

---

17. These transactions generally must, it would seem, have an effect on the balance of payments of the United States. The acceptance by the "Cotton Trade" shipping lines of payment in Japanese yen was partially responsible for the establishment of certain of the conferences in-

volved in that trade. See page 303 of 186 F.Supp.

18. See footnote 3, supra.

19. Of course, antitrust conspiracy cases are usually built on circumstantial evidence. United States v. Morgan, D.C. S.D.N.Y.1953, 118 F.Supp. 621.

314

1951, 341 U.S. 593, 71 S.Ct. 971, 95 L.Ed. 1199; and United States v. National Lead Co., D.C.S.D.N.Y.1945, 63 F.Supp. 513, affirmed 1947, 332 U.S. 319, 67 S. Ct. 1634, 91 L.Ed. 2077.

The case of American Banana Co. v. United Fruit Co., 1909, 213 U.S. 347, 29 S.Ct. 511, 53 L.Ed. 826, relied on by the movants, does not preclude Sherman Act jurisdiction over agreements in restraint of trade carried out, at least in part, within the United States.

Whether the matter here comes within the purview of the Sherman Act is largely a question of fact that may be brought out by the inquiry of the grand jury.

A thorough review of the facts and prior court decisions as they relate to the question here, leads this Court to the conclusion that the grand jury should be permitted to determine by inquiry whether in the words of the Attorney General's Committee, supra, pp. 76, 77, the agreements entered into by the shipping lines in the Cotton Trade do have a "substantial anticompetitive effect on our foreign commerce."

## IV

Many of the movants seek to quash the subpoenas duces tecum on the basis that they are unreasonable and/or oppressive and therefore an abuse of the grand jury process.

The test of whether a subpoena is unreasonable or oppressive appears to come down to a question of the circumstances of the particular case, consonant with certain rules that seem to have evolved over the years in applying that test.

The fact is not lost on this Court that the numbers of documents sought from many of the movants are extensive and that their production may entail a great deal of time, expense and inconvenience.[20] However, neither has it escaped the notice of this Court that the Government has from the beginning been somewhat conciliatory in its demands with respect to the subpoenas.[21]

The Fourth Circuit ruled on the production of corporate records recently in the case of United States v. United States District Court, 4 Cir., 1956, 238 F.2d 713, wherein it was held that a grand jury could investigate corporate records without a showing as to their materiality. The only limitation imposed was that process of the court could not be used to compel their production if it would be unreasonable or oppressive. The court also stated that if the grand jury wanted the evidence analyzed and summarized by Government counsel assisting in the investigation, this could be done.[22] The objection is made here, however that the subpoenas are violative of the Fourth Amendment of the Constitution in that they are unreasonable and oppressive. However, the court in the case of Application of Radio Corporation, supra, indicated how such a claim could be resolved [13 F.R.D. 171]:

"The general principles which emerge from the cases establish that in order to overcome the Fourth

footnotes

20. It is noted that the immunity, from prosecution, penalty, etc., for evidence presented in a proceeding under the Sherman Act, is granted only to natural persons. 15 U.S.C.A. §§ 32, 33. See United States v. Harte-Hanks Newspapers, 5 Cir., 1958, 254 F.2d 366.

21. Government memorandum of February 8, 1960, pp. 23, 24: "As to time within which to comply with the subpoena, no question is raised. Many shipping lines who do not challenge these same subpoenas have asked for and been granted additional time for compliance upon demonstrating a particular hardship.

Similar accommodation is available to the movants. Movants have been relieved of the necessity of producing and identifying the documents in the presence of the grand jury. A method permitting the forwarding of documents by mail or express, accompanied by an affidavit of compliance, has been offered to each recipient of these subpoenas * * *."

22. Throughout this opinion the term "Government" has been used to define counsel appointed by the Justice Department to aid in the instant grand jury inquiry.

Amendment objections, the subpoena shall describe with reasonable particularity the papers to be produced and shall be confined to a reasonable period of time. The meaning of 'reasonable' depends, of course, upon the particular facts of each case, so that prior decisions are of limited value."

The subpoenas in this case are addressed to documents pertaining to what is characterized as the Far East Trade, the Cotton Trade, and the African Trade. An examination of the subpoenas in the Cotton Trade shows that they ask for four years' records (as opposed to six years in the other Trades), specific items are requested and specific items [see, for instance, items 5, 5(a), 5(k) and 5(r) of certain of the subpoenas] are exempted. The fact that some of those parties subpoenaed have already complied would seem to indicate that they are not so loosely phrased as to defy compliance therewith.

The period of time covered above is in sharp contrast to the twenty-year period covered in In re Petition of Borden, D.C. N.D.Ill.1948, 75 F.Supp. 857, or the eleven-year period in In re World Arrangements, supra, wherein the subpoenas were upheld.

The claim is also made that the breadth or the scope of the subpoenas in the number of documents sought is unreasonable. As suggested by certain of the movants, subpoenas requiring only a relatively small percentage of an organization's files may be considered unreasonable and oppressive. Application of Certain Chinese Family B. & D. Ass'n, D.C.N.D.Cal.1956, 19 F.R.D. 97. However, this is not inconsistent with cases upholding subpoenas calling for a large number of company's records, Application of Radio Corporation, supra, for as pointed out by the Supreme Court, the documents must only meet the requirement that they be adequate for, but relevant to, the inquiry. Oklahoma Press Publishing Co. v. Walling, 1946, 327 U.S. 186, 66 S.Ct. 494, 506, 90 L.Ed. 614. The court there went on to state that this cannot be "reduced to a formula; for relevancy and adequacy or excess in the breadth of the subpoena are matters variable in relation to the nature, purposes and scope of the inquiry."

Inconvenience is relative to size, for any subpoena may be burdensome to some extent. Application of Radio Corporation of America, supra. The fact is, however, that investigations of possible antitrust violations almost invariably involve great amounts of records, etc., because of the size of the corporation or of the industry of which the corporation is a part. In re Motions to Quash Subpoenas, D.C.S.D.Cal.1939, 30 F.Supp. 527. The fact that the industry being investigated is a regulated industry, and that the Government itself may have contributed to its growing complexity, number of records maintained, or even its great size, should, rather than impede, tend to permit an investigation of that which is subject to regulation, or that which *affects* such regulation. See In re Investigation of World Arrangements, supra.

Judge Hand noted in his opinion in McMann v. Securities and Exchange Commission, 2 Cir., 1937, 87 F.2d 377, 109 A.L.R. 1445, that where, as here, the suppression of truth may be involved in an inquiry concerning the public interest, a subpoena duces tecum should be quashed only where the private interest is supreme. In this case, the Court finds that the public interest outweighs the private interest.

It should also be noted that there appears to be less evidence of a "fishing expedition" or harassment here than there was in the McMann and Borden cases, where such arguments were not accepted.[23]

23. Certain of the movants involved in the South African Trade seek the quashing of the subpoenas here on the basis of what seems to be harassment in that the matter is now under investigation by the Maritime Board and the movant must deal with the same matter in two forums unless the subpoenas are quashed. 25

**316**

The claim that language difficulties in identifying documents make these subpoenas unreasonable was answered by the court in the World Arrangements case, where it was pointed out that some companies served identical subpoenas had already complied without interpretational difficulties. If unusual difficulties in this respect are encountered in this case, there is little doubt that some arrangement can be made with the Government to overcome it.

The Court here, having taken into consideration the nature, purpose, and scope of the inquiry, the extent to which the complaining parties subpoenaed are involved in the matters under investigation, and the inconvenience, time and expense that may be incurred by the movants as weighed against the public interest, denies the motions to quash for reasons of unreasonableness or oppressiveness.

## V

The further claim is made by certain of the movants that a federal grand jury has no authority to initiate an investigation of any crimes in the shipping industry that are non-infamous or misdemeanors. The Government meanwhile contends that the grand jury does have the authority to investigate possible misdemeanors as well as felonies.

Since, on the basis of the foregoing discussion, there is ample evidence to establish a belief that possible felonies may have been committed in the shipping industry which the grand jury may consider, and in view of the fact that the Congressional Committee which forwarded this matter for grand jury action apparently thought so also, the movants claim appears ill-founded.

The Fifth Amendment of the Constitution provides for presentment or indictment by a grand jury of persons found guilty of capital or otherwise infamous crimes. However, Rule 7(a) of the Federal Rules of Criminal Procedure, 18 U.S.C., provides, in part, that an "offense which *may* be punished by imprisonment for a term exceeding one year or at hard labor shall be prosecuted by indictment, or if indictment is waived, it may be prosecuted by information. Any other offense may be prosecuted by indictment or by information." (Emphasis supplied.) Although movants claim that Rule 7(a) confers no substantive authority on the grand jury, apparently the Supreme Court has historically and still feels otherwise. Smith v. United States, 1959, 360 U.S. 1, 79 S.Ct. 991, 3 L.Ed.2d 1041.

It should also be remembered that even though a crime is called a misdemeanor, if it carries a possible punishment of more than one year imprisonment, it has been held to be an infamous crime. Ex parte Brede, D.C.E.D.N.Y.1922, 279 F. 147, affirmed 1923, 263 U.S. 4, 44 S.Ct. 8, 68 L.Ed. 132.

However, Rule 7(a) does not confine prosecution by indictment to infamous crimes. It merely requires that infamous crimes must be so prosecuted. It should, therefore, appear that violations of the Sherman Act, supra, may be prosecuted by indictment. The Supreme Court in the early case of Hale v. Henkel, supra, apparently felt this was the case, and this appears to be the position of the Supreme Court today as noted collaterally in the Smith case [360 U.S. 1, 79 S.Ct. 997]:

"The use of indictments in all cases warranting serious punishment was the rule at common law * * * [citations]. The Fifth Amendment made the rule mandatory in federal prosecutions in recognition of the fact that the intervention of a grand jury was a substantial safeguard against oppressive and arbitrary proceedings. * * * Hale v. Henkel * * * Rule 7(a)

Fed.Reg. 520, 25 Fed.Reg. 881. However, the subpoenas here were careful to state that the documents requested were to exclude those filed with the Maritime Board and material otherwise publically available; therefore, the harassment in this respect appears relatively slight.

recognizes that this safeguard may be waived, but only in those proceedings which are non-capital * * ".

The Government cites Costello v. United States, 1956, 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397, to the effect that when the grand jury was incorporated into the Fifth Amendment, it was intended to function substantially like its English progenitor. They then cite 4 Blackstone, Commentaries 301, as defining the English progenitor of the indictment:

"An indictment is a written accusation of one or more persons of a crime or misdemeanor, preferred to, and presented upon oath by, a grand jury."

The Government's contentions appear to be correct, despite the objections of the movants, for the historically correct application of the Fifth Amendment to misdemeanors as they were at common law seems to be clearly set forth in United States v. Shepard, D.C.E.D.Mich. 1870, 1 Abb. U.S. 431, Fed.Cas.No.16,273, where it is stated:

"Congress by proposing, and the states by ratifying that [Fifth] amendment, left all offenses not capital or infamous to be prosecuted by information or by indictment, as the circumstances of each case should seem to require, and as the common law would sanction. Indeed, this constitutional provision produced no change in the practice of law, except, perhaps, as regards the class of misdemeanors regarded as infamous crimes, and which might before the amendment, be prosecuted by infor-

mation. * * * We regard the converse of the fifth amendment to be that persons may be held to answer for crimes other than such as are capital or infamous upon information or indictment, according to the course of the common law."

It appears therefore that Rule 7(a) merely restates what has historically always been the rule.

Accordingly, the Court holds that there is no denial of a Fifth Amendment right in this case by permitting the grand jury here to investigate the possible violation of laws which may constitute misdemeanors as well as felonies.

## VI

Certain of the movants admit that this Court has the power to require the firms over which it has personal jurisdiction to produce documents in their custody, whether physically located in the United States or not, but question whether the Court in the sound exercise of its discretion should permit its power to be so used. Movant's memorandum filed April 15, 1960, p. 2. Others question even the existence of such power.

The Government meanwhile takes the position that not only does the Court have the personal jurisdiction and thus the power to order the documents requested by the subpoenas, but that it would be inappropriate to withdraw the subpoenas.[24]

A review of the cases cited by the Government leads to the conclusion that this Court has the power, authority, and jurisdiction to require the produc-

---

24. Papers filed by the Government on March 25, 1960: "It is the law of the United States that a court may require a firm over which it has personal jurisdiction to produce documents in its possession, custody or control whether or not the documents are physically located within the United States or its territories. Various cases pertinent to this aspect of United States law are Societe Internationale v. Rogers, 357 U.S. 197 [78 S.Ct. 1087, 2 L.Ed.2d 1255] (1958) (documents located in Switzerland); Mines and Metals Corporation v. SEC, 200 F.2d 317 (9th Cir., 1952) (documents located in Panama); SEC v. Minas de Artemias, 150 F.2d 215 (9th Cir., 1945) (documents located in Mexico); United States v. Standard Oil Co. [D.C.] (N.J.), 23 F.R.D. 1 (1958) (documents located in various countries throughout the world); United States v. Watchmakers of Switzerland Information Center, Civil 96–170 [D.C.], S.D.N.Y., Transcript, February 19, 1957 [1958, 168 F.Supp. 904], pp. 23, 25–26 (documents located in Switzerland); and United States v. ICI, Civil No. 24–13, S.D.N.Y., July 1, 1948 (documents located in the United Kingdom)."

tion of all the documents called for in all of the subpoenas herein involved.

However, while the case of Cobbledick v. United States, 1940, 309 U.S. 323, 60 S.Ct. 540, 84 L.Ed. 783, appears to indicate that an order quashing a subpoena duces tecum requiring the production of documents before a grand jury is not a final order for appeal purposes, as it arises in this case, such a rule places a heavy burden on the Court here, it would seem, to insure that the timely objections made by the British, Canadian, Danish, French, German, Italian, Japanese, the Netherlands, Norwegian, and Swedish Embassies with respect to the subpoenas here, be given the greatest consideration.[25]

Inasmuch as there can be little objection to the production of documents of the foreign corporations physically located in this country, either at their own or their agents' offices, and the documents of the United States corporations physically located in foreign countries, the objections of the movants with respect thereto are ruled inappropriate.[26]

However, with respect to the documents of foreign corporations physically located in foreign countries, it would seem that this investigation would not be impeded if the Court reserved its opinion on the matter of production of those documents, at this time. Meanwhile the Government will be better informed, and so may better inform the Court, of the need for those documents, should such need still exist, after the inquiry has progressed to some extent.

## VII

 On January 18, 1960, the Embassy of the Philippines transmitted to the Secretary of State a note in which it objected to the issuance of a subpoena directing the Philippine National Lines

to produce certain documents. The claim was made that the Philippine Lines was an instrumentality of the Philippine Government and that the Government did not wish to waive its sovereign immunity from suit or process of this Court.

The State Department refused to recognize or allow the Philippine Government's claim of immunity. The State Department's reply of January 25, 1960, reads in part as follows:

"In considering requests of a foreign government for a grant of foreign sovereign immunity from the jurisdiction of courts in the United States, the Department of State follows the so-called restrictive theory of sovereign immunity. Under this theory a foreign government (including its instrumentalities) is entitled to immunity from the jurisdiction of the courts of the territorial sovereign only with regards to government acts (jure imperii) as distinguished from private or commercial activities (jure gestionis).

"Since it appears to the Department that the Philippine National Lines is engaged in commercial activities, the Department of State regrets that it cannot take the action requested in your note."

No doubt the fact that in recent times many countries have nationalized certain industries has led to the tendency to adopt the "restrictive theory" of governmental immunity. In re Investigation of World Arrangements, etc., supra; Coale v. Societe Cooperative Suisse Des Charbons, Basle, D.C.S.D.N.Y.1921, 21 F.2d 180.

Government counsel here maintains that the cases of Republic of Mexico v. Hoffman, 1945, 324 U.S. 30, 65 S.Ct. 530, 89 L.Ed. 729, and National City Bank of New York v. Republic of China, 1955,

25. There was no indication in the correspondence on file emanating from the foreign embassies that they would interfere with the production of documents located in their respective countries if this Court, in the exercise of its discretion, found that it was necessary.

26. See United States v. Imperial Chemical Industries, D.C.S.D.N.Y.1951, 100 F. Supp. 504, decree, D.C.S.D.N.Y.1952, 105 F.Supp. 215.

348 U.S. 356, 75 S.Ct. 423, 99 L.Ed. 389, indicate the status and activities of a foreign government are foreign policy matters for consideration by the political branch of the government, and, since the State Department has denied immunity here, the Court must also refuse to recognize the Philippine National Lines' claim of sovereign immunity.

The Movant here, on the other hand, alleges that the State Department's refusal to recognize its claim of sovereign immunity is not in any way binding on this Court, and that in fact it would be proper for this Court to make the determination inasmuch as the "restrictive theory" of sovereign immunity adopted by the State Department recognizes that its opinions on sovereign immunity are not binding on the courts.[27]

It is true that the Supreme Court in Berizzi Bros. Co. v. S. S. Pesaro, 1926, 271 U.S. 562, 46 S.Ct. 611, 70 L.Ed. 1088, equated government operated merchant ships with the maintenance and training of a naval force. However, as noted in 26 Dept. State Bull. p. 985, the United States has a long established policy of not claiming immunity in foreign jurisdictions for its own merchant vessels.

The movant relies heavily on In re Investigation of World Arrangements, supra, where Judge Kirkland of this Court quashed a subpoena duces tecum issuing against Anglo-Iranian Oil Company on the grounds (1) that the company was indistinguishable from the Government of Great Britain, though the Government only owned 35 per cent of its capital but "controlled" the company, and (2) to cite a foreign sovereign into our courts is contrary to the law of nations.

With respect to item (2), Judge Kirkland concluded that the successful prosecution of the Anglo-Iranian Oil Co. would result in a charge and finding that the British Government was guilty of violating the law of the United States. He envisaged the risk of belligerent action if foreign government property were seized.

It should be noted, however, that Judge Kirkland distinguished the case of United States v. Deutsches Kalisyndikat Gesellschaft et al., D.C.S.D.N.Y.1929, 31 F.2d 199, where a suit to enjoin violations of the antitrust laws was upheld against a French corporation in which the Government of France held an 11⁄45th interest. The Judge held that a French corporation that was involved in a "commercial venture, entirely divorced from any governmental function" is far different than a "sea-faring island-nation maintaining a constant supply of maritime fuel".

The present case seems to fall somewhere in between the World Arrangements and the Gesellschaft cases.

The Justice Department here alleges that the movant is a purely commercial venture, and the State Department refuses to recognize the claim of sovereign immunity. Meanwhile, at this juncture in the proceedings, the Court is unable to ascertain whether the grand jury will use the information it seeks to possibly attempt to indict the Philippine National Lines or use the information to indict others.

However, it appears that nothing would be lost in this instance if the Court should reserve its views as to the issuance of the subpoena as it relates to the

---

27. Movant's counsel observes in a memorandum filed February 28, 1960, that the so-called "restrictive theory" of sovereign immunity referred to in the State Department's letter of January 25, 1960, was first announced in a letter to the Acting Attorney General from the State Department's Acting Legal Advisor. 26 Dept.State Bull. 984 (1952), and that therein the position taken was that a "slight shift in policy by the executive cannot control the courts * * *." However, that statement, p. 985, reads in full, as follows: "It is realized that a shift in policy by the executive cannot control the courts, but it is felt that the courts are less likely to allow a plea of sovereign immunity where the executive has declined to do so."

Philippine National Lines, pending a showing by the Government through information obtained in the course of the investigation, that (1) the movant's activities are substantially, if not entirely, commercial; (2) the records are needed for the furtherance of the investigation to prosecute others; and/or (3) evidence exists of its joining with others to violate federal laws. The Court's order will reflect this.

## VIII

 Certain of the Japanese shipping lines have moved to quash the subpoenas duces tecum on the grounds that their production is in violation of the Treaty of Friendship, Commerce, and Navigation between the United States and Japan, effective October 30, 1953 (TIAS 2863; 4 U.S.T. 2063). They specifically cite Article XVIII, which provides in part as follows:

> "The two Parties agree that business practices which restrain competition, limit access to markets or foster monopolistic control, and which are engaged in or made effective by one or more private or public commercial enterprizes or by combination, agreement or other arrangement among such enterprizes, may have harmful effects upon commerce between their respective countries. Accordingly, each Party agrees upon the request of the other Party to consult with respect to any such practices and to take such measures as it deems appropriate with a view to eliminating such harmful effects."

On the basis of a letter from the State Department to Senate Committee on Foreign Relations (Hearings, Subcommittee of the Committee on Foreign Relations, U.S. Senate, 82nd Cong., 2d Sess., May 9, 1952, p. 29), and the language of the court in United States v. R. P. Oldham Co., D.C.N.D.Cal.1957, 152 F.Supp. 818, denying a motion to dismiss on the basis of this Treaty provision in a criminal action charging a conspiracy in violation of the Sherman Act, this Court concludes that the issuance of subpoenas in this case to the Japanese lines does not violate Article XVIII of the Treaty.

The Ambassador of Japan in a letter addressed to the Secretary of State dated March 7, 1960, objected to the subpoenas here in question, but did not ground the objection specifically on the basis of the Treaty provisions. Rather the objections were confined to the production of documents located in the territorial jurisdiction of Japan.

The State Department, in a reply dated March 25, 1960, merely indicated that in accordance with the Embassy's request a copy of their note of March 7, 1960 was being forwarded to the Court. However, the State Department, in their reply, did indicate that the Justice Department was willing to discuss specific problems of compliance regarding the subpoenas with representatives of the Japanese shipping lines.

The objections on the grounds of territorial jurisdiction are treated elsewhere in this opinion.

## IX

 Certain of the movants of Netherlands nationality claim that the compliance with the subpoenas here may be in contravention of the provisions of the Treaty of Friendship, Commerce, and Navigation, Article I (TIAS 3942, effective December 5, 1957) existing between the United States and The Netherlands:

> "1. Each Party shall at all times accord fair and equitable treatment to the nationals and companies of the other Party, and to their property, enterprizes and other interests.

> "2. Between the territories of the two Parties there shall be, in accordance with the provisions of the present treaty, freedom of commerce and navigation."

It is considered that not only does Article I not support any claim for the quashing of the subpoenas here, but that Article VI (2) actually anticipates that such court orders must issue at times and only asks that searches, etc., be conducted according to law and with regard

for the convenience of the nationals of the parties to the treaty.

The movants also assert that compliance with the subpoenas here would be in violation of section 39 of The Netherlands Economic Competition Law. With respect to Java-Pacific Lines, since this is a New York corporation, it is on a parity with other domestic corporations and cannot, in the Court's opinion, invoke any Netherlands laws to avoid complying with the subpoena. Securities and Exchange Commission v. Minas de Artemias, 9 Cir., 1945, 150 F.2d 215. The privilege of immunity to process here extends to countries and not to corporations.

Since the Court has reserved its views with respect to production of subpoenaed documents of foreign corporations located in foreign countries, the Court need not go into the question at this time of the effect of the subpoenas to produce documents located in The Netherlands other than to note that in its opinion Section 39 of The Netherlands Economic Competition Law does not in any way appear to prevent the production of documents of United States companies located in The Netherlands or the documents of Netherlands companies or their agents located in this country.[28]

## X

1. The motions to quash the subpoenas duces tecum are denied.

2. The subpoenas duces tecum are modified as hereinbefore specifically set forth.

3. Counsel are directed to prepare an appropriate order reflecting, among other things, the fact that the Court has reserved its views, i. e. taken the matter under advisement, as to the production or inspection of the subpoenaed documents, etc., of foreign corporations physically located in foreign countries, and as to the subpoena as it relates to the Philippine National Lines, pending certain showings by the Government as the inquiry progresses.

28. See footnote 24, supra.