**Application of RADIO CORP. OF AMERICA.**

United States District Court
S. D. New York.
Oct. 23, 1952.

Cahill, Gordon, Zachry & Reindel, New York City, for Radio Corp. of America, John T. Cahill, Jerrold G. Van Cise, Robert L. Werner, John W. Nields, New York City, of counsel.

Myles J. Lane, U. S. Atty., New York City, Malcolm A. Hoffmann, Sp. Asst. to the Atty. Gen., for the Government. Bernard M. Hollander, Washington, D. C., Daniel Reich, Elliott H. Feldman, New York City, Newell A. Clapp, Acting Asst. Atty. Gen., Marcus A. Hollabaugh and Lester L. Jay, Sp. Assts., to the Atty. Gen., of counsel.

WEINFELD, District Judge.

The Grand Jury for the Southern District of New York is currently engaged in an investigation, initiated by the Attorney General, into alleged violations of the antitrust laws and other criminal statutes in the radio, television and related electronics industry. The Radio Corporation of America (hereinafter referred to as RCA) is one of twenty corporations upon whom subpoenae duces tecum were served requiring the production before the Grand Jury of volumi-nous records. RCA moves to quash or modify the subpoena under Rule 17(c) of the Federal Rules of Criminal Procedure, 18 U.S.C.A., on two grounds: (a) that it is so broad, sweeping, vague and indefinite that compliance would be unreasonable and oppressive and in contravention of the Fourth Amendment to the Constitution of the United States; and (b) that insofar as it requires production of records and documents pertaining to matters already disposed of by a consent decree entered in 1932 in the United States District Court for the District of Delaware, it is unreasonable. I first consider the latter branch of the motion.

In 1930, the United States of America instituted a civil suit against RCA and thirteen other defendants in the United States District Court for the District of Delaware. The defendants were charged with conspiracy to restrain trade and to monopolize the field of manufacture of radio apparatus and the transmission of messages by radio and wire. The amended petition alleged in part that RCA, by virtue of agreements with the co-defendants and other parties, had combined "into a single accumulation or pool" more than 4,000 patents and that it had refused to grant certain licenses and had granted other licenses on objectionable terms.

In November 1932, the litigation was terminated as a result of a stipulation between the parties, upon which the Court entered a consent decree covering domestic matters.[1] It required divestiture by a number of the defendants of their stock and other interests in RCA and compelled the modification of certain exclusive patent cross-licensing agreements among the defendants. In addition, the decree enjoined them from combining in restraint of trade by restricting the freedom of any defendant to grant licenses under its own patents, or by the exchanging of exclusive licenses with the defendants or other parties, or by other similar devices. The decree then provided:

"* * * that nothing herein contained shall be deemed or construed to

1. Other decrees were entered in May 1934 and July 1935, relating to foreign matters.

prevent any defendant from acquiring or assigning or agreeing to acquire or assign patents or other property or granting or agreeing to grant, or continuing to act under, exclusive rights thereunder or in connection therewith, or taking any other action, if not done to restrict liberty of action as part of a plan or purpose to restrain interstate or foreign commerce of the United States as prohibited by the Anti-Trust Laws of the United States, it being recognized that patents and patent rights may be bought, sold and transferred as may other kinds of property and subject only to like limitations."

The decree also made reference to the stipulation of the parties, wherein the Department of Justice stated that it had no objection to certain agreements comtemplated by the defendants with respect to cross and sublicensing.

In 1942, the Government moved in the District of Delaware to reopen the decree on the sole ground that it was no longer in the public interest. But since the Government did not offer proof that circumstances had changed since its entry justifying modification, Judge Maris denied the motion. In holding that benefits had been conferred upon the defendants, he stated that since "these consent decrees are based upon an agreement made by the Attorney General which is binding upon the Government the defendants are entitled to set them up as a bar to any attempt by the Government to relitigate the issues raised in the suit or to seek relief with respect thereto additional to that given by the consent decrees." [2] The Government appealed from the ruling, but on its own motion the appeal was dismissed.[3]

The movant leans heavily upon the consent decree and Judge Maris' subsequent ruling to support that branch of its motion which seeks to quash or modify the subpoena insofar as it requires the production of records pertaining to matters covered by

the decree. It claims that a very substantial part of the subpoena is directed towards the granting or refusing of patent licenses by it, the acquisition or non-acquisition of patents and patent licenses and other related matters, all of which, it is contended, clearly fall within, and are controlled by, the scope of the consent decree. The Government concedes that a portion of the subpoena is addressed to RCA's present patent and patent licensing system for the period from 1934 to date, covering the maximum life of a patent, but points out that none of the patents under which RCA grants licenses could have been in existence in 1932, when the consent decree was entered. Thus, in the main, the controversy centers about RCA patent and licensing policies subsequent to the entry of the decree.

If I understand RCA's position, it is, in broad outline, that the decree is not only res judicata as to all matters covered by it up to the date of its entry in 1932, but, further, that it operates prospectively and is a bar to any future proceeding, civil or criminal, and that the sole and exclusive remedy remaining to the Government is to move in the District Court of Delaware, which entered the decree, either (1) for its modification upon a showing of changed circumstances, if such there be; or (2) to punish for contempt in the event of violations of the terms of the decree. In summary—that upon the entry of the decree, the District Court of Delaware pre-empted jurisdiction, both civil and criminal, to the exclusion of all other District Courts, with respect to patents and patent rights under licensing agreements or otherwise, whether or not these were owned or in existence at the time of the decree. RCA concludes that, since the powers of the Grand Jury are coextensive with those of the District Court, no purpose would be served, and it would be unreasonable, to require the production of records pertaining to patents and licensing arrangements covered by the decree since any prosecution in this District based upon

2. United States v. Radio Corporation of America, D.C., 46 F.Supp. 654, 656.

3. United States v. Radio Corporation of America, 1943, 318 U.S. 796, 63 S.Ct. 851, 87 L.Ed. 1161.

violation of such matters is barred. Counsel concedes there is "no direct precedent" to support this contention. Whatever its merits, and even were I to assume, arguendo, the validity of the position advanced, the plea is premature.

The proceedings of the Grand Jury are, of course, secret, except as disclosure is authorized by law.[4] While the general course of its inquiry is known to be directed towards antitrust violations in the radio, television and related electronics field, the particular activities and persons about whom the investigation may be centered are unknown. The industry has expanded tremendously since the entry of the decree in 1932. Much of the general subject matter of the present inquiry was then non-existent. Television, color television and frequency modulation were either unknown or in their infancy—the difference "between an infant and a full grown man."[5]

The subpoena is not limited to the production of RCA's patents and licensing records, but demands, as well, many documents, dating back to 1934, dealing with prices, production, color television, frequency modulation and other items which relate principally to expanded segments of the industry not touched upon by the consent decree. The power of the Grand Jury to inquire into these matters is not questioned. The tie-in between these latter items and the patent and licensing policies of RCA does not appear; but the connection, if any, may relate to the conduct of corporations other than the movant.

■ The current investigation is not confined to RCA. It is an investigation of an entire industry—of which, to be sure, RCA is a significant part. But it is only one of twenty companies whose records are under subpoena. Whether RCA's records have been demanded because of its conduct, or because of the conduct of others, or because of the relationship amongst the various companies in the general industry cannot be determined from these papers. While it may be assumed that the activities of RCA, as well as those of the others, are under scrutiny, yet in its capacity as a witness it can neither object to the production of records on the ground of incompetency or irrelevancy nor raise any issue as to the jurisdiction of the Grand Jury and the Court over the subject matter that is under inquiry.[6]

RCA's records may furnish a vital link in the chain of evidence indicating violations of the antitrust laws by others. The Grand Jury may indict RCA together with others on a conspiracy charge. The Grand Jury may indict RCA alone. It may base such an indictment on conduct unrelated to any issue considered under the consent decree. It may indict others than RCA. And, of course, it may indict no one at all. In sum, whether any indictments will be returned, and if so, the subject matter, the precise charge and against whom made, are matters of sheer speculation.

■■ The Grand Jury "is a grand inquest, a body with powers of investigation and inquisition, the scope of whose inquiries is not to be limited narrowly by questions of propriety or forecasts of the probable result of the investigation, or by doubts whether any particular individual will be found properly subject to an accusation of crime. * * * [W]itnesses are not entitled to take exception to the jurisdiction of the grand jury or the court over the particular subject-matter that is under investigation. In truth it is in the ordinary case no concern of one summoned as a witness whether the offense is within the jurisdiction of the court or not. At least, the court and grand jury have authority and jurisdiction to investigate the facts in order to determine the question whether the facts show a case within their jurisdiction."[7] Thus, in the instant case, the arguments as to res ju-

---

4. Rule 6(e), Federal Rules of Criminal Procedure.

5. See United States v. Aluminum Company of America, D.C., 20 F.Supp. 608, 611, affirmed 302 U.S. 230, 58 S.Ct. 178, 82 L. Ed. 219.

6. Blair v. United States, 250 U.S. 273, 282–283, 39 S.Ct. 468, 471, 63 L.Ed. 979.

7. Blair v. United States, supra, footnote 6, 250 U.S. at pages 282–283, 39 S.Ct. at page 471.

dicata and lack of jurisdiction are premature.[8] If and when a true bill is returned by the Grand Jury wherein the movant is named as a defendant, it may then, of course, interpose such plea in bar as it may be advised.

To foreclose the use of these records by a Grand Jury would be an unwarranted intrusion upon its historic right to conduct an unhampered and adequate investigation into possible violations of the law. Under the circumstances, the requirement for the production of patent and licensing records is neither unreasonable, oppressive nor an abuse of the Court's processes.

The second branch of RCA's motion attacks the subpoena upon the ground that it is so broad in scope as to render compliance unreasonably burdensome.

█ The general principles which emerge from the cases establish that in order to overcome the Fourth Amendment objections, the subpoena shall describe with reasonable particularity the papers to be produced[9] and shall be confined to a reasonable period of time.[10] The meaning of "reasonable" depends, of course, upon the particular facts of each case, so that prior decisions are of limited value.[11]

█ Here, none of the records called for go back further than 1934—a little longer than the life of a patent. Considering the nature of the inquiry, the tremendous size and ramifications of the industry under investigation, the time span does not seem unreasonable. No general objection is pressed, nor has the Court found, that the requested documents are not described with reasonable particularity. Hence, the gist of this aspect of the motion is simply that the assembly of the documents commanded by the subpoena imposes a heavy burden upon movant's representatives, resulting in dislocation of its normal activities, and puts it to considerable financial expense.

█ I am inclined to agree with RCA that Rule 17(c) of the Federal Rules of Criminal Procedure gives the Court a power to quash or modify subpoenas additional to that derived from the Fourth Amendment. But that does not change the result. For, in my view, RCA has not made out a sufficiently compelling case under either standard.

Prior to the return of the present motion, the Assistant Attorney General in charge of the presentation of evidence before the Grand Jury by written communication, addressed to RCA's attorney and filed with the Clerk of the Court, expressly eliminated from the scope of the subpoena the provision calling for the production of records of various affiliated and subsidiary corporations and further defined and limited the scope of the records to be produced before the Grand Jury. These limitations meet, to a substantial degree, some of the objections urged by movant's representatives. They particularly weaken the force of the objection that a task of tremendous magnitude and great expense will be imposed if the subpoena is not vacated. Further limitations have been offered by the Assistant Attorney General and a modus operandi has been proposed to lessen the problem of compliance, but pending determination of the present application, the proposal has been rejected.

It is, of course, acknowledged that even taking into account the reduced scope of the subpoena, the personnel of RCA will be put upon to comply with its terms. But the great number of documents called for are an inevitable concomitant of RCA's

---

8. Application of Texas Co., D.C., 27 F. Supp. 847; In re American Medical Association, D.C., 26 F.Supp. 58; In re Kittle, C.C., 180 F. 946.

9. E. g., Hale v. Henkel, 201 U.S. 43, 77, 26 S.Ct. 370, 50 L.Ed. 652; Brown v. United States, 276 U.S. 134, 143, 48 S. Ct. 288, 72 L.Ed. 500; In re Eastman Kodak Co., D.C., 7 F.R.D. 760, 763.

10. E. g., Brown v. United States, supra, footnote 9; Petition of Borden Co., D.C., 75 F.Supp. 857, 864.

11. See Application of Texas Co., supra, footnote 8, 27 F.Supp. at page 850; In re Eastman Kodak Co., supra, footnote 9, 7 F.R.D. at page 763.

gigantic size, the broad scope of its far-flung operations and the nature of its corporate structure. The magnitude of RCA's activities and the fact that some of its functions have been decentralized, with consequent dispersal of records in various places, hardly serve as an excuse for denying the Grand Jury the right to inspect documents required by it in the furtherance of its duty.[12]

Inconvenience is relative to size. Any witness who is subpoenaed suffers inconvenience. An individual operating a small business, for example, or a corporation operated by a sole shareholder, may suffer, in like circumstances, more inconvenience than the movant with its thousands of employees. But this inconvenience, whether suffered by witnesses, grand jurors, or jurors, is part of the price we pay to secure the effective administration of justice and the enforcement of our laws.

All in all, this is not one of those rare cases where the Court should exercise its power to deny process to the Grand Jury.[13]

There remain a number of specific objections. The first is that documents are asked for which contain trade secrets. This objection deserves no more than the observation that the proceedings of the Grand Jury are secret.[14] Secondly, it is urged that there is no limitation upon the individuals whose files are to be examined for the relevant material. But it is quite clear that the records of those other than the top corporate officers may significantly bear upon an inquiry into possible antitrust violations. In any event, the Department of Justice is willing to consider further limitations on the files to be searched when a list of company officials and company files are made available to it. Finally, RCA complains that it is unable to identify the persons listed in subparagraph (b) of Paragraph III of the subpoena.[15] This provision should be construed to include only those persons or companies who are known by RCA's officers and employees to own patents, patent rights, or are licensees.

It is, of course, desirable that RCA shall be inconvenienced as little as possible and that a modus operandi in the production of records called for by the subpoena should be reached between RCA and the Government. In the event that this goal is not attained, counsel are invited to submit suggestions for inclusion in the order to be entered hereon.

The motion is in all respects denied.

Settle order on notice.

---

12. In passing, it may be noted that other organizations, also of substantial size, whose records have been subpoenaed, have produced them.

13. Cf. In re National Window Glass Workers, D.C., 287 F. 219.

14. Schmidt v. United States, 6 Cir., 115 F.2d 394, 397; United States v. American Medical Association, D.C., 26 F.Supp. 429, 430.

15. Paragraph III of the subpoena calls for correspondence between RCA and other persons, who are not specified but described only generally. Subparagraph (b) is part of the general description: "b. persons or companies owning patents or patent rights or licensed under patents for the domestic manufacture, use or sale of radio, television or related electronic transmission or receiving equipment, or parts, circuits or components thereof; * * *."