In the Matter of UNITED STATES
of America

v.

Stanley LOSKOCINSKI, Jr., et al.,
Defendants.

No. 75 C 1358.

United States District Court,
E. D. New York.

Sept. 8, 1975.

David G. Trager, U. S. Atty., E. D. N. Y., Brooklyn, N. Y. by Ethan Levin-Epstein, Richard W. Brewster, Asst. U. S. Attys., of counsel, for plaintiff.

Cole & Deitz, New York City by Joseph A. DiBenedetto, Edward N. Meyer, New York City, of counsel, for movant, National Bank of North America.

BRAMWELL, District Judge.

This matter comes before the Court on the application of the United States Attorney for the Eastern District of New York for an order enforcing a Grand Jury *subpoena duces tecum* served upon the Brooklyn Branch of the National Bank of North America (the "Bank") directing that it turn over to the Government certain bank and cashier's checks. Pursuant to Rule 17(c) of the Federal Rules of Criminal Procedure, the Bank has interposed a cross-motion to quash and vacate the said subpoena.

I

The facts of this matter may be briefly summarized as follows: On July 2, 1975 a Brooklyn Branch of the National Bank of North America was the victim of an armed robbery. In addition to the loss of other property, the Bank suffered the loss of eleven (11) blank bank and cashier's checks. All of the stolen checks were bearer instruments, payable on demand.

The Federal Bureau of Investigation, pursuant to its investigation of the robbery, requested officers of the Bank to advise them immediately should any of the stolen checks come into the possession of the Bank during the regular course of its business. The F.B.I. also requested that such checks be immediately delivered to it for fingerprint analysis and for use by the Grand Jury in its investigation of the robbery.

At the time of the writing of this Memorandum and Order, one of the subject checks drawn in the approximate sum of $99,000.00, has already been presented for payment to the Bank by a distant bank to which it had been negotiated. The name of the bank officer appearing thereon had been forged. Consistent with the requirements of the Uniform Commercial Code ("U.C.C." or "Code"), the Bank dishonored and returned the check by its midnight deadline.

Subsequent to the Bank's dishonor and return of the forged check, the United States Attorney served the aforementioned *subpoena duces tecum* upon it directing the Bank to deliver to his office "forthwith upon receipt at any time and from time to time, any and all bank checks, cashier's checks and similar items stolen" in the robbery on July 2, 1975.

The Bank thereafter advised the United States Attorney's Office that it would not comply with the said subpoena. The Bank indicated that, in the view of its Legal Department, the Bank was obligated under New York Law to return a dishonored check through the banking system; that failure to do so might subject the Bank to civil liability for payment. Uniform Commercial Code, §§ 4–301, 4–302 (McKinney 1964).

The Bank, however, offered to cooperate with the Government by making a photostatic copy of any such check available to the United States Attorney's Office. Moreover, the Bank indicated that it would inform the Government of the identity of the presenting bank, so that the subject checks, after their dishonor and return, would be subject to subpoena from that institution.

It is the Bank's position that this approach would delay the date on which the Government would obtain possession of such checks by only a few days, and that such delay would not be prejudicial to the Government's investigation. Moreover, that this approach would eliminate the possibility that the Bank

would be exposed to civil liability under the Code.

However, the Government does not find this alternate approach satisfactory. Thus, the stage has been set for the instant subpoena enforcement proceeding brought on by the Government and for the Bank's motion to quash such subpoena.

## II

 It is beyond dispute that the scope and subject matter of the Grand Jury's investigation in the instant case is both necessary and proper. It is well-settled that the Grand Jury has the power by means of a *subpoena duces tecum* "to require the production of all documents and records relevant to the subject of the investigation." *Application of Certain Chinese Family Benevolent and District Associations*, 19 F.R.D. 97 (N.D.Calif.1956). However, it is also well-recognized that the exercise of this power must not be unreasonable or oppressive and that the subpoena power of the Grand Jury is subject to the supervision of the Courts to insure that it is neither unreasonably nor oppressively exercised. *See Hale v. Henkel*, 201 U.S. 43, 26 S.Ct. 370, 50 L.Ed 652 (1905); *Essgee Company of China v. United States*, 262 U.S. 151, 43 S.Ct. 514, 67 L. Ed. 917 (1922).

It has been said that the Court "has the duty to see that its judicial processes are not abused. It has the power to prevent clear injustice or an abuse of judicial process." *See In re Eastman Kodak Company*, 7 F.R.D. 760, 763 (S. D.N.Y.1947), and cases cited therein.

As was said by the District Court in *Kodak, supra*, at 762:

[I]t is the duty of the Court to see that the process by subpoena, as here, is not unreasonable and oppressive. What constitutes an unreasonable and oppressive subpoena duces tecum naturally has had the consideration of the courts in many cases. There are certain similar considerations to be val-

uated in many of these cases, but each has had to be, as this is to be determined upon its own particular facts. 'Each case must be judged according to the peculiar facts arising from the subpoena . . . and other proper sources.' *United States v. Medical Society*, D.C., 26 F.Supp. 55, 57.

It is obvious, then, that the question which confronts this Court is not the power of the Grand Jury to investigate nor of its concomitant power to subpoena relevant documents. Rather, it is the question of whether, under the circumstances of this case, the exercise of the subpoena power would prove unreasonable or oppressive.

Thus, in the instant case, we have the difficult task of balancing the legitimate interest of the Grand Jury in the subject checks as against the hardship, if any, the Bank will suffer if the *subpoena duces tecum* is enforced.

## III

The Government's position may be summarized as follows: It contends that the Bank has unjustifiably declined to comply with an outstanding, valid, Grand Jury *subpoena duces tecum*. The Government sees no merit in the Bank's apprehensions of possible exposure to civil liability for its failure to adhere to the requirements of New York's Uniform Commercial Code.

The Government forcefully argues that the Bank has failed to honor the subpoena based upon its erroneous interpretation of Section 4–301(1) of the U. C.C. as implemented by Section 4–302.

Section 4–301 provides in pertinent part as follows:

Where an authorized settlement for a demand item (other than a documentary draft) received by a payor bank otherwise than for immediate payment over the counter has been made before midnight of the banking day of receipt the payor bank may revoke the settlement and recover any payment if before it has made final payment

\* \* \* and before its midnight deadline it

(a) returns the items; *or*

(b) *sends written notice of dishonor or nonpayment if the item* is held for protest or *is otherwise unavailable for return.* (Emphasis supplied).

Section 4–302 of the U.C.C. provides that the payor bank will be held liable on the item if it fails to return the item *or* in the alternative, if it fails to send a written "notice of dishonor until after its midnight deadline". The Government contends that the Bank has an easily available method by which it may, as a payor bank, insulate itself from liability for the late dishonor of a "bad" check. It argues that where an item is "otherwise unavailable" within the meaning of U.C.C. Section 4–301, the Bank need not return same to the payee bank. Rather, the Bank need only "send written notice of dishonor or non-payment" before the midnight deadline in lieu of physically returning the item.

The Government vigorously urges that it was the intent of the drafters of this section of the Code to provide for a viable alternative should circumstances make it impossible to give notice of dishonor by actually returning the item in question. The Government submits that where an item is the subject of a Grand Jury subpoena, it is "otherwise unavailable" within the meaning of Section 4–301. Thus, in its view the Bank need only send written notice of dishonor to the payee bank prior to the midnight deadline to satisfy the requirements of the U.C.C. and to protect itself against civil liability.

Furthermore, the Government maintains that the fact that the Bank *might* face civil liability is not a sufficient ground to quash the subpoena. The Government cites Judge Kaufman's decision in *In the Matter of the Grand Jury Subpoena; United States v. First National City Bank*, 396 F.2d 897 (2d Cir. 1968) ("Citibank") as authority for that proposition.

## IV

The Bank's position may be summarized as follows: First, with respect to the interpretation of the relevant U.C.C. sections, the Bank contends that the Courts of New York have not, as yet, given judicial construction to the meaning of the term "otherwise unavailable". Therefore, in the Bank's view, compliance with the subpoena would not guarantee insulation from liability, since the New York Courts have not held that compliance with a valid Grand Jury subpoena makes the items demanded "otherwise unavailable" within the meaning of Section 4–301.

Second, the Bank forcefully argues that if liability does attach for non-compliance with the U.C.C. requirements, the potential amount of liability is staggering. The Bank maintains, both in its Memorandum of Law and in the supporting affidavit of its Vice President, that if the subject checks yet unreturned are presented to it for payment in sums approximating the amount of the check which the Bank has already dishonored, its possible liability could exceed $1,000,000.00. The Bank has also indicated to the Court that it has received confidential information from an informant that fifty (50) reproductions of each of these blank bank and cashier's checks have been made by the robbers. Therefore, the Bank vigorously points out that assuming the checks are negotiated for sums approximating the sum of the first dishonored check, the Bank's exposure to liability for complying with the Government's subpoena may very possibly reach the sum of $50,000,000.00.

Third, the Bank contends that the Government's subpoena is unreasonable when measured against the Bank's staggering possible civil liability and the limited utilitarian value of the checks to the Grand Jury's investigation. The Bank argues that by the time the subject checks are presented to it for payment, they have been physically handled by numerous persons, whether in the negotiation of the check, its processing

and delivery to the collecting bank, its movement through the Federal Reserve System and in its final processing after presentment to the Bank. The Bank, therefore, maintains that the possibility that any of these subject checks might bear the recognizable fingerprint of one of the robbers at this point in time, long after the robbery, is remote. The Bank emphasizes that the Government has not contended, either in its Memorandum of Law and supporting affidavit or by expert testimony, that the Government reasonably expects the subject checks to have recognizable fingerprints after being handled by a myriad of individuals in the banking system.

Therefore, in the Bank's view, to expose it to any liability let alone for the possible sum of $50,000,000.00 would be both unreasonable and unduly burdensome.

### V

It is clear that the U.C.C. requires the Bank either to return a check which it intends to dishonor to the presenting bank by its midnight deadline, or in the alternative, to "send written notice of dishonor or nonpayment" before the midnight deadline in lieu of physically returning the item where that item is "otherwise unavailable" within the meaning of U.C.C. Section 4–301. Uniform Commercial Code, §§ 4–301(1), 4–302 (McKinney 1964).

▮ Under applicable New York Law, the penalties for failure to comply with the Code's requirements are severe. A bank which fails to act promptly and consistently with the aforementioned requirements would be held liable for the face amount of the check. *See, e. g., Fromer Distributors, Inc. v. Banker's Trust Co.,* 36 A.D.2d 840, 321 N.Y.S.2d 428 (2d Dept.1971).

The Government contends that where an item is the subject of a Grand Jury subpoena, it is "otherwise unavailable" within the meaning of Section 4–301. However, the Government candidly admits in its Memorandum of Law, that

there is a "dearth of authority" on the issue. The Government has failed to provide any authority for this proposition. The Court has been unable to find any authority for the Government's argument.

Moreover, the United States Attorney maintains that the fact that the Bank *might* face civil liability is not a legally sufficient ground to quash the subpoena. The Government relies on the Second Circuit's decision in *Citibank, supra,* in support of its position.

This Court finds that the Government's reliance on *Citibank, supra,* is misplaced. On the contrary, we believe that the clear implication of that decision is that the Court of Appeals would *not* have ordered compliance with the Grand Jury subpoena if the spectre of civil liability confronting the bank had been real and substantial. For in *Citibank, supra,* it was only after a hearing had been held in the District Court on the issue of the Bank's possible exposure to civil liability, in which there was presented uncontradicted expert testimony by a government witness to the effect that "the risk of civil damages was slight and speculative", that compliance with the subpoena was directed. Id at 905. The Court has been unable to discover any authority for the Government's position that the Bank's non-compliance with the subpoena rests on a legally insufficient basis.

▮ After careful consideration, this Court finds that the possible hardship to the Bank were the Grand Jury's *subpoena duces tecum* to be enforced clearly outweighs the interest that that investigatory body has in the subject checks. The Bank has correctly indicated that the New York Courts have not, as yet, given judicial construction to the meaning of the term "otherwise unavailable". Since the applicable law in any future civil litigation arising from the Bank's non-compliance with the provisions of the Code would be that of New York, there exists a real and substantial

possibility that the Courts of New York would construe "otherwise available" differently than the United States Attorney. Thus, the Bank would be subject to the possibility of staggering civil liability. This result would be the same even if we were to hold as a matter of law that checks subject to a Grand Jury subpoena are "otherwise unavailable" within the meaning of U.C.C. 4–301. It is well-settled that such a determination by this Court would not be binding on the Courts of New York in subsequent civil litigation.

Moreover, in the absence of authority to the contrary, this Court is reluctant to hold that the fact that the Bank *might* face civil liability for compliance with the subpoena is an insufficient basis in law for non-compliance with the subpoena.

We believe that the Bank has met its burden of demonstrating the unreasonableness and oppressiveness of the subpoena in the instant case.

Accordingly, the Government's application to enforce the subpoena is denied and the Bank's motion to quash the said subpoena is granted.

It is so ordered.