**In re GRAND JURY SUBPOENA DUCES TECUM ISSUED TO the FIRST NATIONAL BANK OF MARYLAND DATED NOVEMBER 4, 1976.**

Civ. A. No. M–76–1802.

United States District Court,
D. Maryland.

April 15, 1977.

Jervis S. Finney, U. S. Atty., and Herbert Better and Joshua R. Treem, Asst. U. S. Attys., Baltimore, Md., for the Government.

Donald E. Sharpe, Dorothy A. Beatty, Baltimore, Md., for petitioner.

## MEMORANDUM AND ORDER

JAMES R. MILLER, Jr., District Judge.

The First National Bank of Maryland (Bank) moves, pursuant to Rule 17(c), F.R. Crim.P., to quash or modify a grand jury subpoena duces tecum,[1] because the Bank's compliance with the subpoena would allegedly place an unreasonable burden on the Bank absent reimbursement for its costs in retrieving and reproducing the subpoenaed records.

At issue is the question of whether the Bank or society at large must bear ultimate responsibility for the expense involved in retrieving and reproducing the financial records which The Bank Records and Foreign Transactions Act of 1970 requires banks and other institutions to maintain.[2]

Compliance[3] with this grand jury subpoena has required production of 3,718 checks, statements, and similar records at an average cost of fifty cents per record for a total cost of $1,858.[4]

The cumulative costs to the Bank of complying with grand jury subpoenas from 1970 through 1976 were as follows:

| | |
|---|---|
| 1970 — $ | 55.00 |
| 1971 — | 174.40 |
| 1972 — | 4.90 |
| 1973 — | 1,009.10 |
| 1974 — | 1,913.40 |
| 1975 — | 1,733.53 |
| 1976 — | 2,227.40[5] |

The stockholder's equity in the First National Bank of Maryland is 76.6 million dollars, and its parent holding company had net income of 6.04 million dollars for the six months ending June 30, 1976.[6]

## I

This court has been urged by the Bank to follow those cases in which an IRS administrative summons to a bank has been quashed because of the cost of compliance. *See, e. g., United States v. Friedman,* 532 F.2d 928 (3d Cir. 1976); *United States v. Davey,* 426 F.2d 842 (2d Cir. 1970); *United States v. Farmers & Merchants Bank,* 397 F.Supp. 418 (C.D.Cal.1975). Alternatively, the Bank urges the court in its capacity as judicial supervisor of the grand jury to extend to these judicial proceedings the requirement of the Tax Reform Act of 1976 of reimbursement to banks for the expense of compliance with an IRS administrative summons. *See* P.L. 94–455, § 1205(a), 26 U.S.C. § 7610(a)(2). In opposition the Government urges the court to infer from the Bank Secrecy Act, *supra,* a Congressional intent that the costs of compliance with a grand jury subpoena be borne by the bank.

### A. *The IRS Administrative Summons*

■ A series of cases has held that where a bank's compliance with an IRS administrative summons requires an expenditure of money, reimbursement is a precondition to the reasonableness of the subpoena. *See, e.*

---

1. The proceedings in this matter have been sealed to preserve grand jury secrecy. The court has adopted the procedure used by Judge Blair in *In Re Grand Jury Subpoena Duces Tecum,* 342 F.Supp. 709 (D.Md.1972). The original motion (Paper 1) identifies the subpoenas at issue here.

2. Also called the Bank Secrecy Act, 12 U.S.C. §§ 1730d, 1829b, 1951–59, and 31 U.S.C. §§ 1051–62, 1081–83, 1101–05, 1121–22.

3. By stipulation the Bank complied with the subpoena without prejudice to its right to seek reimbursement through a motion to quash. This procedure has been utilized before. *See United States v. Farmers & Merchants Bank,* 397 F.Supp. 418 (C.D.Cal.1975).

4. This amount includes direct labor costs and the expense of copying the document, such as paper, developer, machine maintenance, and rental.

5. The cost of compliance with this subpoena is included in this total.

6. First Maryland Bancorp, Statements of Condition and Statements of Income, June 30, 1976. The income is stated before taxes and after adjustment for securities gains. Only a consolidated Statement of Income is presented; nonetheless, as the Bank accounts for $1.201 billion of the total $1.276 billion assets, the Bank would apparently generate the lion's share of the income.

**48**

*g., Friedman, supra; Davey, supra.* An extension of the reasoning of these cases to the present circumstances is unwarranted for at least two reasons.

First, in a proceeding to enforce administrative subpoenas, Rule 45(b),[7] F.R.Civ.P., provides expressly that the court may condition compliance with the subpoena on reimbursement. Rule 45(b) is made applicable to proceedings to enforce administrative subpoenas by Rule 81(a)(3), F.R.Civ.P.[8] Application of the Civil Rules to administrative subpoenas, especially with respect to this provision for transferring the cost of compliance, reflects a significant policy judgment that the weight and import of administrative subpoenas is comparable to that of ordinary civil subpoenas and that witnesses, particularly neutral witnesses, should not bear unreasonable expenses in complying with subpoenas in either a civil or an administrative proceeding.

The second reason this extension is unwarranted is that in a matter related to a criminal proceeding, such as a grand jury investigation, society's interest in obtaining every man's evidence, the citizen's duty to offer that evidence, and the resulting provisions of Rule 17, F.R.Crim.P., strongly distinguish the civil or administrative subpoena from the criminal subpoena. The Supreme Court has recently observed that "[i]t is beyond dispute that there is a public obligation to provide evidence . . . and that this obligation persists no matter how financially burdensome it may be." *Hurtado v. United States,* 410 U.S. 578, 589, 93 S.Ct. 1157, 1164, 35 L.Ed.2d 508 (1973); *see United States v. Bryan,* 339 U.S. 323, 331, 70 S.Ct. 724, 94 L.Ed. 884 (1950); *Blackmer v. United States,* 284 U.S. 421, 438, 52 S.Ct. 252, 76 L.Ed. 375 (1932); *Blair v. United States,* 250 U.S. 273, 281, 39 S.Ct. 468, 63 L.Ed. 979 (1919); 8 J. Wigmore, *Evidence* § 2192 (McNaughton rev. 1961). In *United States v. Dionisio,* 410 U.S. 1, 93 S.Ct. 764, 35 L.Ed.2d 67 (1973), the court reviewed its cases on grand jury subpoenas and reaffirmed:

"the historically grounded obligation of every person to appear and give his evidence before the grand jury. 'The personal sacrifice involved is a part of the necessary contribution of the individual

---

7. F.R.Civ.P. 45(b) provides in part:
   "[T]he court, upon motion made promptly and in any event at or before the time specified in the subpoena for compliance therewith, may (1) quash or modify the subpoena if it is unreasonable and oppressive or (2) condition denial of the motion upon the advancement by the person in whose behalf the subpoena is issued of the reasonable cost of producing the books, papers, documents, or tangible things."

8. F.R.Civ.P. 81(a)(3) provides in part:
   "These rules apply to proceedings to compel the giving of testimony or production of documents in accordance with a subpoena issued by an officer or agency of the United States under any statute of the United States except as otherwise provided by statute or by rules of the district court or by order of the court in the proceedings."
   Rule 81(f) clarifies that "officer" or "agency" includes the Internal Revenue Service. Furthermore, the Advisory Committee Comment to Rule 81(a)(3) states:
   "The added sentence makes it clear that the rules apply to appeals from proceedings to enforce administrative subpoenas. . . .

And, although the provision allows full recognition of the fact that the rigid application of the rules in the proceedings themselves may conflict with the summary determination desired . . . it is drawn so as to permit application of any of the rules in the proceedings whenever the district court deems them helpful."
Finally, the Internal Revenue Code provides that the IRS summons be enforced by "appropriate process." 26 U.S.C. §§ 7402, 7604. Although the *Friedman* court reached an opposite conclusion, 532 F.2d at 936, its conclusion is undercut by its failure to consider Rule 81(f) or to consider the Comment to Rule 81(a)(3). In addition, the weight of authority is that the Federal Rules of Civil Procedure do apply to proceedings to enforce an IRS summons. *See United States v. Turner,* 480 F.2d 272 (7th Cir. 1973); *United States v. Ruggeiro,* 425 F.2d 1069 (9th Cir. 1970), *cert. denied,* 401 U.S. 922, 91 S.Ct. 863, 27 L.Ed.2d 826; *United States v. Roundtree,* 420 F.2d 845 (5th Cir. 1969); *cf. S.E.C. v. Howatt,* 525 F.2d 226 (1st Cir. 1975) (S.E.C. summons).

to the welfare of the public.' . . . And while the duty may be 'onerous' at times, it is 'necessary to the administration of justice.'"

410 U.S. at 9–10, 93 S.Ct. at 769. (Citations omitted).

This strong public policy is reflected in Rule 17, F.R.Crim.P.,[9] which authorizes the court to quash or modify an unreasonable or oppressive subpoena, but, unlike F.R. Civ.P. 45(b), does not provide for a court ordered shifting of costs. While the cost of compliance with a grand jury subpoena will bear on the issue of the reasonableness of the subpoena, the obligation to provide evidence persists in the face of all but genuine financial oppression. *See United States v. Loskocinski,* 403 F.Supp. 75 (E.D.N.Y.1975). ($50,000,000 liability possibly resulting from compliance); *Subpoena Duces Tecum* (SMCRC), 405 F.Supp. 1192 (N.D.Ga.1975) (virtually impossible to comply with subpoena at its own expense).

For these reasons, this court declines to extend the rule relating to IRS administrative summonses to subpoenas issued by the grand jury.

### B. *Analogy to the Tax Reform Act of 1976*

Alternatively, the court is urged to exercise its supervisory power over the grand jury and to extend to these criminal proceedings the provision of the Tax Reform Act of 1976 that requires reimbursement to banks for the cost of compliance with an IRS administrative summons. *See* P.L. 94–455, § 1205(a); 26 U.S.C. § 7610(a)(2).[10] Congress has directed that the IRS provide for the reimbursement, under appropriate conditions, of a bank's direct costs in complying with an IRS summons. *See* H.R. Conf.Rep.No.94–1515, at 486, U.S.Code Cong. & Admin.News 1976, p. 4118 (1976); Sen.Rep.No.94–938, Pt. I, at 373–74, U.S. Code Cong. & Admin.News 1976, p. 3439 (1976) (Senate amendment adding reimbursement provision). Although the committee reports do not refer to the developing case law, they reflect an acute awareness of the cost which banks and other third-party record keepers bear. *Id.,* H.R. Rep.No.94–658, at 309, U.S.Code Cong. & Admin.News 1976, p. 2897 (1975) (cost awareness but no reimbursement provision). The new section authorizes the expenditure and replaces case-by-case judicial proceedings with routine administrative payments under a formal rate schedule.[11] Apparently Congress was made aware of the "unduly burdensome," *id.,* costs placed on third-party record keepers, and in its legislative wisdom believed that administrative payments for compliance with IRS administrative summonses would minimize the necessity for the filing of civil suits to enforce the summonses, thereby enhancing the efficient administration of the tax code.

As noted above, however, a grand jury's criminal investigation is distinct from the tax collection process of the IRS. The obligation to give evidence has always been strong in a criminal proceeding, particularly in a grand jury investigation. *See, e. g.,*

---

**9.** F.R.Crim.P. 17(c) provides in part:
"The court on motion made promptly may quash or modify the subpoena if compliance would be unreasonable or oppressive."

**10.** The Act adds a new section which provides in part:
"SEC. 7610. FEES AND COSTS FOR WITNESSES.
"(a) In general.—The Secretary shall by regulations establish the rates and conditions under which payment may be made of—
\* \* \* \* \* \*
"(2) reimbursement for such costs that are reasonably necessary which have been directly incurred in searching for, reproducing, or transporting books, papers, records, or other data required to be produced by summons.
"(b) Exceptions.—No payment may be made under paragraph (2) of subsection (a) if—
"(1) the person with respect to whose liability the summons is issued has a proprietary interest in the books, papers, records or other data required to be produced, or
"(2) the person summoned is the person with respect to whose liability the summons is issued or an officer, employee, agent, accountant, or attorney of such person who, at the time the summons is served, is acting as such."

**11.** The schedule has not yet been proposed in the Federal Register. (2/28/77)

*Hurtado, supra; Dionisio, supra.* The difference between grand jury subpoenas and IRS summonses has been strengthened, not weakened, by Congress' decision to authorize administrative reimbursements to third-party record keepers for compliance. *Compare* 26 U.S.C. § 7610(a) *with* Rule 45(b), F.R.Civ.P., *and, e. g., United States v. I.B.M.,* 62 F.R.D. 507 ((S.D.N.Y.1974). For these reasons the analogy to the Tax Reform Act is rejected.

### C. *Inferred Congressional Intent*

■ The Government urges that the court infer from the Bank Records and Foreign Transaction (Bank Secrecy) Act of 1976, a Congressional intent that banks bear the expense of retrieving and reproducing the financial records which the Act requires a bank to keep. Congress did express an expectation that banks would bear the minimal additional expenses of microfilming the records initially.[12] The House and Conference Committee Reports,[13] however, reveal no express Congressional statement pertaining to allocation of the cost of retrieving and reproducing the records for use in judicial or administrative investigations. Although Representative Stanton briefly spoke of the retrieval problem,[14] the floor debates demonstrate that no significant Congressional attention was given to the allocation of retrieval costs. *See* 116 Congressional Record 16951 (House debate, May 25, 1970), 32621 (Senate debate Sept. 18, 1970), 35937 (Senate agrees to Conference Report, Oct. 9, 1970), 36569 (House agrees to Conference Report, Oct. 13, 1970).

The two Supreme Court cases dealing with the Bank Records Act do not address the issue of allocation of retrieval costs. *United States v. Miller,* 425 U.S. 435, 96 S.Ct. 1619, 48 L.Ed.2d 71 (1976); *California Bankers Ass'n v. Schultz,* 416 U.S. 21, 94 S.Ct. 1494, 39 L.Ed.2d 812 (1974).

Since neither Congress nor the Supreme Court has expressly or impliedly dealt with the question of the allocation of retrieval costs under the Bank Records Act, the Government's reliance on the Act itself to allocate those costs to the banks is misplaced.

The Supreme Court has concluded in reference to records required to be kept by the Bank Records Act that "it was recognized by Congress that such required records would 'not be made automatically available for law enforcement purposes [but could] only be obtained through existing legal process.' H.R.Rep.No.91–975, p. 10 (1970); *see* S.Rep.No.91–1139, p. 5 (1970)." *California Bankers Ass'n,* 416 U.S. at 27, 94 S.Ct. at 1501. The question, therefore, is what does "existing legal process" require as grounds for a motion to quash or modify a grand jury subpoena?

### II

A district court has the power to quash or modify a grand jury subpoena duces tecum where compliance would be unreasonable or oppressive. Rule 17(c), F.R.Crim.P.; *see, e. g., In re Horowitz,* 482 F.2d 72 (2d Cir. 1973); *Loskocinski, supra; SMCRC, supra;* 8 *Moore's Federal Practice* ¶ 17.11 (1976 ed.).

In considering motions to quash on the grounds of unreasonableness, courts have considered the length of time covered by the documents, the specificity of the request, the nature of the investigation, the relevance of the request to the investigation, the expense of the compliance relative

---

**12.** *E. g.,* H.R.Rep.No.91–975, 1970 U.S.Code Cong. & Adm.News 4394, 4396, and 4410, where Committee Chairman Patman wrote:

"The microfilming costs should be borne willingly by the banking community as part of their civic responsibility to combat crime."

**13.** H.R.Rep.Nos.91–975, 91–1587, 1970 U.S. Code Cong. & Adm.News 4394–4416.

**14.** Rep. Stanton observed:

"With modern equipment making such a record could be done. But that misses the point. The information is useful only if it could be processed to seek out possible illegal transactions. That is a time consuming process. I venture the opinion a huge battery of "G" men would bog down the first day in their efforts to process even the checks of only one of our large banks which processes 1½ million checks a day." 116 Cong.Rec. 16967 (May 25, 1970).

to the resources of the subpoenaed party, and the collateral consequences, such as civil or criminal penalties, of compliance. *See, e. g., United States v. United States District Court*, 238 F.2d 713 (4th Cir. 1956), cert. denied, 352 U.S. 981, 77 S.Ct. 382, 1 L.Ed.2d 365; *In re Grand Jury Subpoena Duces Tecum*, 342 F.Supp. 709 (D.Md.1972); *In re Linen Supply Co.*, 15 F.R.D. 115, 118–19 (S.D.N.Y.1953); *Application of Radio Corporation of America (R.C.A.)*, 13 F.R.D. 167, 172 (S.D.N.Y.1952); *Petition of Borden*, 75 F.Supp. 857 (N.D.Ill.1948).

Where the subpoenaed person is the object of a grand jury investigation, subpoenas have not been quashed except where the costs of compliance would have been destructive to the person. In *SMCRC, supra*, a grand jury investigation into antitrust violations was quashed as unreasonable absent reimbursement, after the court found that compliance would cost between $908,811 and $1,759,015, that compliance would "entirely disrupt SMCRC's business," and that SMCRC had gross income of $3,261,581 and gross expenses of $3,251,947. The court concluded that "it is virtually impossible for SMCRC to comply with this subpoena at its own expense." 405 F.Supp. at 1199. *Accord, e. g., Petition of Borden, supra* (50 tons of files, 2 attorneys, 26 employees, over 10 years). That degree of oppressiveness has not been established here.

The Bank here is not the object of a grand jury investigation; rather, the Bank holds records which are required to be kept by the Bank Records Act of 1970. The Bank's status as an innocent record keeper does not, however, necessarily entitle it to reimbursement. The various factors listed above must still be considered. Thus in *Loskocinski, supra*, a grand jury subpoena requiring the production of forged cashiers checks was quashed because the payor bank's failure to return the dishonored checks to the presenting bank by the midnight deadline would expose the subpoenaed payor bank to a possible $50,000,000 in civil liability on the checks. 403 F.Supp. at 79.

Compared to the potential liability in *Loskocinski*, the Bank's expenses here are minimal; even the Bank's cumulative expenses from 1970 through 1976 are comparatively minimal. Relative to its net income and total resources, the Bank here suffers no greater burden than the witness or grand juror who forgoes his or her earnings in excess of the statutory attendance fees. As Judge Weinfield observed 25 years ago:

"Inconvenience is relative to size. Any witness who is subpoenaed suffers inconvenience. An individual operating a small business, for example, or a corporation operated by a sole shareholder, may suffer, in like circumstances, more inconvenience than [a major corporation] with . . . thousands of employees. But this inconvenience, whether suffered by witnesses, grand jurors, or jurors, is part of the price we pay to secure . . . the enforcement of our laws."

*R.C.A., supra*, 13 F.R.D. at 172. The Bank's cost of compliance with this grand jury subpoena is part of the necessary contribution to the welfare of the public. *See, e. g., Hurtado; Dionisio, supra.*

Accordingly, it is this 15th day of April, 1977, ORDERED that the Bank's motion to quash is DENIED.